HAZEL S. HAWKINS, as Personal Representative of the Estate of Neal Hawkins, Jr., DECEASED, AND AS PERSONAL REPRESENTATIVE OF THE STATUTORY BENEFICIARIES, PLAINTIFF v. SSC HENDERSONVILLE OPERATING COMPANY, LLC D/B/A THE BRIAN CENTER HEALTH AND REHABILITATION-HENDERSONVILLE, DEFENDANT ·

No. COA09-23

(Filed 2 March 2010)

**Medical Malpractice— expert witness—national standard of care—regulated nursing home**

The trial court erred by denying defendant's motion for a directed verdict in a medical malpractice action involving a nursing home where plaintiff's experts testified that a national standard of care applied to all nursing homes due to federal regulations, but did not testify to any familiarity with the nursing home in question or the community in which it is located.

Appeal by defendant from judgment entered 6 December 2007 and order entered 22 February 2008 by Judge Dennis J. Winner in Henderson County Superior Court. Heard in the Court of Appeals 31 August 2009.

*Poliakoff and Associates, P.A., by Gary Poliakoff and Raymond Mullman, Jr., for plaintiff-appellee.*

*Ellis & Winters, LLP, by Leslie C. O'Toole; Proskauer Rose LLP, by Malcolm J. Harkins, III; and Proctor & Ervin, P.C., by Lori Proctor, for defendant-appellant.*

BRYANT, Judge.

The plaintiff in a medical malpractice action must tender an expert who can testify to a familiarity with the standards of practice in the same or a similar community as defendant.[1] In the present case, plaintiff sought to establish the standard of care applicable to the care provided to her 86-year-old husband by defendant nursing home through the testimony of three medical experts. Because these witnesses testified regarding a national standard of care rather than the standards of practice in the community in which defendant is located, we reverse the denial of defendant's motion for a directed verdict.

---

1. N.C. Gen. Stat. § 90-21.12; *see also Henry v. Southeastern Ob-Gyn Assocs., P.A.*, 145 N.C. App. 208, 211, 550 S.E.2d 245, 247, *aff'd* 354 N.C. 570, 557 S.E.2d 530 (2001).

*Facts*

Neal Hawkins Jr. was admitted to The Brian Center Health and Rehabilitation—Hendersonville (Brian Center) on 19 April 2004. He was 86 years old and suffered from dementia, peripheral vascular disease, hypothyroidism, high blood pressure, and chronic obstructive pulmonary disease. He had previously experienced several bouts of pneumonia. He was at high risk for falling and was believed to have fallen several times at home.

Hawkins' comprehensive care plan provided nine care measures to mitigate his risk of falling. On 4 September 2004, the Brian Center documented his first fall in the facility. Hawkins' care plan was not revised at that time. Brian Center staff reported a general noticeable deterioration in Hawkins' condition in December 2004, and on 7 January 2005 Hawkins was again diagnosed with pneumonia.[2]

On 11 February 2005, Hawkins fell three different times. At approximately 12:30 a.m., Hawkins was found on the floor next to his bed. A Brian Center nurse ascertained that Hawkins had no apparent injury. The nurse reported the incident to Dr. Murphy, Hawkins' personal physician, by fax.

Another nurse found Hawkins on the floor at approximately 11:15 a.m. Dr. Murphy was again notified of the fall. An x-ray was taken after the second fall; no fractures were found; and Hawkins denied being in pain.

At approximately 8:30 p.m. Hawkins was found on the floor a third time. A third nurse assessed Hawkins. He denied pain or discomfort, and could move his extremities well, but his blood pressure was found to be lower than normal. The following morning, the nurse on duty notified Dr. Murphy by fax that Hawkins had fallen.[3]

On 18 February 2005, Hawkins was transferred to Pardee Hospital where another x-ray revealed a fractured left hip. The next day, Hawkins underwent hip replacement surgery. On 23 February 2005, Hawkins left Pardee Hospital and was admitted to Pardee Care Nursing Home.

Hawkins was readmitted to Pardee Hospital on 13 March 2005 with a methicillin-resistant staphylococcus infection. He suffered

2. Defendant began operating the Brian Center on 1 January 2005.

3. Dr. Murphy later testified that 14 February 2005 was the first day he was notified that Hawkins had fallen three times the previous Friday; however, he was not notified about the drop in Hawkins's blood pressure.

from pneumonia secondary to that infection, and was admitted to hospice care. Hawkins died at Pardee Hospital on 22 March 2005. His death certificate lists pneumonia as the primary cause of death.

On 9 January 2006, Mrs. Hawkins (plaintiff), as a representative of Neal Hawkins' estate, filed a complaint against The Brian Center—Hendersonville, Inc., Brian Center Health & Rehabilitation—Hendersonville, Inc., and SavaSeniorCare, LLC. SSC Hendersonville Operating Company, LLC was later substituted for SavaSeniorCare, LLC. The complaint was subsequently amended to name Mariner Health Care Management Company as a defendant.[4] In the complaint, plaintiff alleged negligence and recklessness, negligence per se, breach of contract, and negligent spoliation of evidence.

A jury trial began on 5 November 2007. Before opening statements, plaintiff withdrew the claims for breach of contract and negligence per se. Three witnesses testified on plaintiff's behalf as to the standard of care applicable to defendant's care: Dr. Jonathan Klein—as an expert in the fields of internal medicine, geriatric medicine, and as a nursing home medical director board certified in internal medicine and geriatrics, licensed to practice in Virginia; Katherine Johnson—as an expert in the field of nursing, licensed in Florida; and Janet White—as an expert in the field of nursing administration, licensed in the state of Virginia. Each witness was a medical practitioner licensed outside of North Carolina. Each witness testified that defendant breached the nationwide standard for nursing home care established by the federal Omnibus Reconciliation Act ("OBRA").

After plaintiff's case-in-chief and again before submission of the matter to the jury, defendant made a motion under Rule 50 for a directed verdict. The trial court denied the motion. The jury returned a verdict finding that defendant caused Hawkins' injury but not his death and awarded Hawkins' estate $200,000.00. The jury determined defendant to be liable for punitive damages in the amount of $600,000.00. On 6 December 2006, the trial court entered judgment in accordance with the jury verdict.

On 17 December 2006, defendant filed a Rule 50 Motion for Judgment Notwithstanding the Verdict. Alternatively, plaintiff sought

---

4. At the time of Hawkins' admission, The Brian Center was operated by Mariner Health Care Management Company and Living Centers-Southeast, Inc. On 1 January 2005, the facility's operation was assumed by SSC Hendersonville Operating Company, LLC. The complaint against Mariner Health Care Management Company and Living Centers-Southeast, Inc. d/b/a Brian Center Health and Rehabilitation/Hendersonville was dismissed by consent order filed 1 December 2006.

a new trial and/or a set-off of the verdict amount. The trial court denied defendant's motion. From both the judgment entered in accordance with the jury verdict and the order denying defendant's Rule 50 motion, defendant appeals.

---

Defendant raises several arguments on appeal; however, because the following argument is dispositive, we address only that argument. Defendant argues that the trial court erred in denying its Rule 50 motion for a directed verdict in light of the fact that plaintiff failed to establish the standard of care in the same or a similar community as required by N.C. Gen. Stat. § 90-21.12. "On appeal our standard of review for a judgment notwithstanding the verdict is the same as that for a directed verdict; that is, whether the evidence was sufficient to go to the jury." *Whitaker v. Akers*, 137 N.C. App. 274, 277, 527 S.E.2d 721, 724 (citation and internal quotation marks omitted), *disc. review denied*, 352 N.C. 157, 544 S.E.2d 245 (2000).

"One of the essential elements of a claim for medical negligence is that the defendant breached the applicable standard of medical care owed to the plaintiff." *Goins v. Puleo*, 350 N.C. 277, 281, 512 S.E.2d 748, 751 (1999). "Plaintiffs must establish the relevant standard of care through expert testimony." *Crocker v. Roethling*, 363 N.C. 140, 142, 675 S.E.2d 625, 628 (2009) (citations omitted). "To meet their burden of proving the applicable standard of care, plaintiffs must satisfy the requirements of N.C.G.S. § 90-21.12 . . ." *Id.*

Under North Carolina General Statute, section 90-21.12:

> In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of medical, dental, or other health care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession *with similar training and experience situated in the same or similar communities* at the time of the alleged act giving rise to the cause of action.

N.C. Gen. Stat. § 90-21.12 (2007) (emphasis added).

We interpreted this statute in *Henry*, 145 N.C. App. 208, 550 S.E.2d 245, as requiring more from a plaintiff than testimony merely establishing a national standard of care. *Id.* at 211, 550 S.E.2d at 247.

In *Henry*, the plaintiffs brought a medical malpractice action to recover for the alleged negligent prenatal and obstetrical care rendered by defendants. *Id.* at 208, 550 S.E.2d at 246. The plaintiffs tendered one expert, an OB-GYN specialist licensed in South Carolina and Georgia. *Id.* at 208-09, 550 S.E.2d at 246. Although that expert testified he was familiar with the national standard of care, "he failed to testify in any instance that he was familiar with the standard of care in [the same community as the defendant] or similar communities." *Id.* at 210, 550 S.E.2d at 246. The trial court found that the plaintiffs failed to establish the relevant standard of care, and directed the verdict in the defendant's favor. *Id.* at 209, 550 S.E.2d at 446.

On appeal, the plaintiffs argued that their expert could establish the standard of care applicable to defendant because their expert was familiar with the national standard. *Id.* at 209, 550 S.E.2d at 246. They also argued that their expert's familiarity with the standard of care in Spartanburg, South Carolina enabled him to testify to the standard of care in Chapel Hill or Durham, North Carolina. *Id.* "Thus, argue[d] [the] plaintiffs, [the expert witness] could testify to the applicable standard of care in Wilmington even though he was unacquainted with its medical community." *Id.* This Court rejected the plaintiff's theory. "To adopt [the] plaintiffs' argument, this Court would have to ignore the plain language of N.C. Gen. Stat. § 90-21.12 and its evidentiary requirement that the 'similar community' rule imposes, as well as well-established case law." *Id.* at 212, 550 S.E.2d at 248. *Cf. Smith v. Whitmer*, 159 N.C. App. 192, 582 S.E.2d 669, (2003) (affirming a grant of summary judgment for defendant when plaintiff's expert could testify only to a national standard of care, but there was no evidence that a national standard of care was the same standard of care practiced in defendants' community).

We have elsewhere stated that "[w]here the standard of care is the same across the country, an expert witness familiar with that standard may testify despite his lack of familiarity with the defendant's community." *Haney v. Alexander*, 71 N.C. App. 731, 736, 323 S.E.2d 430, 434 (1984), *disc. review denied*, 313 N.C. 329, 327 S.E.2d 889-90 (1985); *see also Marley v. Graper*, 135 N.C. App. 423, 428-30, 521 S.E.2d 129, 133-34 (1999), *disc. review denied*, 351 N.C. 358, 542 S.E.2d 214 (2000); *Brooks v. Wal-Mart Stores, Inc.*, 139 N.C. App. 637, 656-57, 535 S.E.2d 55, 67 (2000), *appeal dismissed and disc. review denied*, 353 N.C. 370, 547 S.E.2d 2 (2001). Responding to this trend, *Henry* stated that "[t]his Court, however, has recognized very few 'uniform procedures' to which a national standard may apply,

HAWKINS v. SSC HENDERSONVILLE OPERATING CO.

[202 N.C. App. 707 (2010)]

and to which an expert may testify." *Henry*, 145 N.C. App. at 211, 550 S.E.2d at 247.[5]

*Henry* produced three separate opinions from the Court of Appeals, with one judge concurring in the result and another dissenting. The North Carolina Supreme Court affirmed our holding without further comment. *Henry*, 354 N.C. 570, 557 S.E.2d 530. Because of the fractured disposition in *Henry*, a subsequent opinion of this Court questioned whether *Henry* constitutes controlling authority. See *Cox v. Steffes*, 161 N.C. App. 237, 245, 587 S.E.2d 908, 914 n.1 (2003), *disc. rev. denied*, 358 N.C. 233, 595 S.E.2d 148 (2004).

However, this issue appears to have been clarified by the more recent opinion in *Pitts v. Nash Day Hosp., Inc.*, 167 N.C. App. 194, 605 S.E.2d 154 (2004), *aff'd* 359 N.C. 626, 614 S.E.2d 267 (2005). In *Pitts*, we stated,

> the critical inquiry is whether the doctor's testimony, taken as a whole, meets the requirements of N.C. Gen. Stat. § 90-21.12. In making such a determination, a court should consider whether an expert is familiar with a community that is similar to a defendant's community in regard to physician skill and training, facilities, equipment, funding, and also the physical and financial environment of a particular medical community.

*Id.* at 197, 605 S.E.2d at 156. *Pitts* recognizes that "[t]here appears to be some conflict concerning what testimony sufficiently obviates the need to show an expert's familiarity with a defendant's community under N.C. Gen. Stat. § 90-21.12." *Id.* at 197, 605 S.E.2d at 156 n.2. Nevertheless, *Pitts* stated that "*Henry* requires some level of familiarity with a defendant's community even if an expert testifies the standard is the same across the country." *Id.*[6]

Here, plaintiff presented three witnesses, admitted as experts in their respective fields, who testified to the standard of care ap-

---

5. Plaintiff argues that "[t]he type of care rendered in nursing homes is precisely the type of care that the Court in *Henry* suggested would support a national standard of care."[P4] On the contrary, the only procedures that *Henry* explicitly mentions as subject to a national standard are "the taking of vital signs or the placement of bedpans." *Henry*, 145 N.C. App. at 211, 550 S.E.2d at 247. We do not consider plaintiff's allegations of defendants' "reckless conduct, willful violation of policies and procedures, lack of training and competence, and intentional falsification of [Hawkins'] clinical record" to be analogous to the misplacement of bedpans.

6. We recognize that this issue has yet to be fully addressed by our Supreme Court and we are therefore bound by the holdings of this Court. We nonetheless further recognize that this issue is ripe for a definitive ruling by our Supreme Court and therefore urge our Supreme Court to grant discretionary review.

plicable to The Brian Center: Dr. Jonathan Klein, Katherine Johnson, and Janet White. Dr. Klein was tendered as an expert witness in the fields of internal medicine, geriatric medicine, and as a nursing home medical director. He testified to the existence of a standard that applies to all licensed nursing homes in the United States:

> Dr. Klein: That is called OBRA regulations for short; it's the Omnibus Reconciliation Act, which was a law that was enacted to consolidate and unify all the various, different standards that were, unfortunately, not quite up to par in many cases and this was to assure that the certain class of people, specifically, the vulnerable elderly, in nursing homes were taken care of correctly throughout the whole country.
>
> . . .
>
> Counsel: All right, sir. And, again, would that law also apply to the Brian Center in Hendersonville, North Carolina?
>
> Dr. Klein: Yes, it would.
>
> Counsel: Like all nursing homes in the United States?
>
> Dr. Klein: Correct.
>
> Counsel: And is that a standard you're talking about for the care of patients in nursing homes, that OBRA?
>
> Dr. Klein: Yes. It was utilized to, again, to unify under one heading all the things that nursing homes were supposed to do.
>
> Counsel: All right. And regardless of whether a nursing home is in Hendersonville, North Carolina, or in northern Virginia or in any other state, are all licensed nursing homes under that standard called OBRA?
>
> Dr. Klein: Yes.

Katherine Johnson was tendered as an expert in the field of nursing. She testified that Federal "OBRA" regulations established a standard of care that applied to all nursing homes, including The Brian Center. On *voir dire*, prior to her admission as an expert witness, Johnson testified that she had never been licensed in North Carolina, did not do any analysis of the level of training and experience of the nursing resources available to facilities in Hendersonville or communities similar to Hendersonville, was not acquainted in any way with the nursing home community in the Hendersonville area, did not

research the standard of care for facilities in the Hendersonville area as of February 2005, did not study the variations of facilities, available equipment, funding, or available hospitals in the Hendersonville area as of February 2005, and conducted no analysis of resources available in the Hendersonville community or of the standard of care practiced in communities with similar resources as the Brian Center in February 2005.

Finally, Janet White was admitted as an expert in the field of nursing home administration. She submitted the following testimony on the standard of care applicable to the Brian Center:

> White: In our industries the OBRA standards are the regulations that we consider to be a national standard, a community standard. We establish our policies to address those, to assure compliance and we utilize those in our day-to-day operations.
>
> Counsel: All right. Now, does OBRA also apply to the Brian Center in Hendersonville, North Carolina?
>
> White: Yes, sir.
>
> Counsel: Is it a nationwide standard?
>
> White: Yes, sir, it is.
>
> Counsel: And it's applied at all licensed nursing facilities in the United States?
>
> White: I would certainly think it would be. I suppose it's possible, if there was a strictly private pay facility, that might not receive government funding, it's possible that may not be the case, but I would say in every nursing home that receives any type of government funding, OBRA regulations would be the standard of care.
>
> Counsel: All right. And it's your understanding then that OBRA would apply to [The] Brian Center in Hendersonville, North Carolina?
>
> White: Absolutely.

This testimony indicates that the witnesses opined that a national standard of care applied to the Brian Center. But the witnesses did not testify to any familiarity with the Brian Center or the community in which it is located. They did not testify regarding whether its standards of practice were in fact the same or different from the national standard. In short, they did not demonstrate any level of familiarity

with defendant's community or a similar community as required by *Henry* and *Pitts*. The testimony presented by defendant's experts did not remedy the omission. *See Cox*, 161 N.C. App. at 246, 587 S.E.2d at 914.

We therefore hold that the trial court erred in denying defendant's motion for a directed verdict. Defendants were entitled to a directed verdict as a matter of law. In light of our holding, we need not address further argument by defendants.

Reversed.

Chief Judge MARTIN and Judge HUNTER, Robert C., concur.