IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
May 4, 2010 Session

## ESTATE OF MARTHA S. FRENCH v. STRATFORD HOUSE ET AL.

**Appeal by Permission from the Court of Appeals, Eastern Section**
**Circuit Court for Hamilton County**
**No. 04C490      L. Marie Williams, Judge**

_____

**No. E2008-00539-SC-R11-CV - Filed January 26, 2011**

_____

The administratrix of the estate of the deceased brought this wrongful death suit against the defendant nursing home and its controlling entities, alleging damages as the result of ordinary negligence, negligence per se, and violations of the Tennessee Adult Protection Act. The trial court granted the defendants' motion for partial summary judgment, holding that the Tennessee Medical Malpractice Act applied to the ordinary negligence claims, thereby precluding allegations of negligence per se or violations of the Tennessee Adult Protection Act. The trial court also dismissed a claim for punitive damages. The Court of Appeals affirmed, but vacated the portion of the order dismissing the punitive damages claim. This Court granted the administratix's application for permission to appeal in an effort to clarify the standards governing nursing home liability and to resolve a conflict in the decisions rendered by the Court of Appeals. We hold that, because the administratrix of the estate of the deceased has alleged violations of the standard of care pertaining to both medical treatment and routine care, she has made claims based upon both medical malpractice and ordinary negligence. Further, she may offer proof of negligence per se and violations of the Tennessee Adult Protection Act as support for her ordinary negligence claims. We affirm the Court of Appeals' reinstatement of the punitive damages claim. The judgment of the Court of Appeals is, therefore, affirmed in part and reversed in part. The cause is remanded to the trial court.

**Tenn. R. App. P. 11; Judgment of the Court of Appeals Affirmed in Part and**
**Reversed in Part and Case Remanded**

GARY R. WADE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, and SHARON G. LEE, JJ., joined. WILLIAM C. KOCH, JR., J., filed a separate opinion dissenting in part.

S. Drake Martin and Michael Chad Trammell, Jackson, Tennessee; Richard C. May,

Knoxville, Tennessee; and Brian G. Brooks, Greenbrier, Arkansas, for the appellant, Kimberly S. French.

Alaric H. Henry and Thomas Mitchell Horne, Chattanooga, Tennessee, for the appellees, Stratford House, OP Chattanooga, Inc., Tandem Health Care, Inc., and Tandem Health Care of Ohio, Inc.

Clifford Wilson and Melissa Bradford Muller, Nashville, Tennessee, for the appellees, HP/Stratford House, Inc. and HP/Holding, Inc.

Karla C. Hewitt, Nashville, Tennessee, for the amicus curiae, Tennessee Citizen Action.

Wayne Allen Ritchie II, Nashville, Tennessee, for the amicus curiae, Tennessee Association for Justice.

F. Laurens Brock, David J. Ward, and T. Ryan Malone, Chattanooga, Tennessee; and John Lyell, Nashville, Tennessee, for the amicus curiae, Tennessee Health Care Association.

## OPINION
### Facts and Procedural History[1]

In 2000, Martha French ("Ms. French"), age 54, suffered a debilitating stroke, her second, and was admitted to total care at the Highland Manor Nursing Home ("Highland Manor") in Portland. Also afflicted with diabetes, arterial fibrillation, depression, hypertension, and anxiety, Ms. French periodically experienced pressure ulcers[2] at Highland Manor. After Ms. French had been a patient at Highland Manor for approximately three years, her daughter, Kimberly S. French (the "Administratrix"), arranged for her transfer to the Stratford House, a long-term care facility in Chattanooga. At the time of her admittance on April 3, 2003, Ms. French had no pressure ulcers. Because of her immobility, however, Ms. French was at significant risk of developing ulcers. The facility's Patient Transfer Form, Resident Assessment Protocol ("RAP") Summary, and Care Plan all documented Ms. French's susceptibility to pressure ulcers. A course of treatment was prescribed in order to

---

[1] This case was decided on a motion for partial summary judgment. These facts, therefore, have been drawn from the pleadings and the evidentiary materials filed by the parties.

[2] A pressure ulcer, more commonly known as a "pressure sore" or "bed sore," is an area of damaged skin and tissue that occurs when the circulation to vulnerable parts of a person's body is cut off. The affected tissue dies without adequate blood flow to the area. Those unable to change positions, such as individuals who are bedridden or wheelchair-bound, are at the greatest risk for the development of pressure ulcers. MayoClinic.com, Bedsores (pressure sores), Definition, available at http://www.mayoclinic.com/health/bedsores/DS00570 (last visited Jan. 11, 2011).

prevent a reoccurrence of the condition. According to the plan of care established at the facility, Ms. French had to be turned by nursing home personnel and repositioned frequently, kept clean and dry after incontinence, and provided with adequate hydration and nutrition.[3]

Ms. French's condition deteriorated during her time at the Stratford House. By the middle of July 2003, she had both a low-grade fever and low blood pressure and, on July 23, the Administratrix arranged for a transfer to Erlanger Medical Center ("Erlanger"), where physicians attempted to increase her blood pressure by hydrating her intravenously. When she was admitted to Erlanger, Ms. French had a urinary tract infection and a number of pressure ulcers that had become infected. She developed pulmonary swelling after her admission, and medical devices were required to assist with her breathing. A feeding tube was inserted. Later, when the Administratrix discovered the gravity of her mother's condition, she instructed the physicians to halt the aggressive measures, including the breathing assistance and the use of a feeding tube. Ms. French died on July 26, 2003. Her death certificate lists sepsis (commonly known as blood poisoning) as the cause of her death.

On March 22, 2004, the Administratrix filed suit on behalf of Ms. French's estate against the Stratford House, OP Chattanooga, Inc., Tandem Health Care, Inc., Tandem Health Care of Ohio, Inc., Cookeville Long Term Facility, Inc., f/k/a Tandem Health Care of Tennessee, Inc., HP/Stratford House, Inc., and HP/Holding, Inc. (the "Defendants").[4] The Administratrix alleged (1) ordinary negligence; (2) negligence per se based upon violations of state and federal nursing home regulations; and (3) violations of the Tennessee Adult Protection Act ("TAPA"), Tenn. Code. Ann. §§ 71-6-101 to -122 (2004 & Supp. 2010). The complaint sought both compensatory and punitive damages. In response, the Defendants contended that all of the Administratix's allegations qualified as medical malpractice claims under the Tennessee Medical Malpractice Act ("TMMA"), Tenn. Code. Ann. §§ 29-26-115 to -122 (2000 & Supp. 2010).

There is significant dispute between the parties regarding the cause of Ms. French's death. During depositions, Dr. Absalom Tilley, the medical director of several nursing homes in Arkansas, testified on the Administratrix's behalf. He asserted that it was more

---

[3] The parties dispute whether Ms. French was malnourished when she was admitted to the Stratford House.

[4] During the majority of the period that Ms. French was a resident at the Stratford House, it was owned and operated by HP/Stratford House, Inc. and HP/Holding, Inc. On May 17, 2003, operations were transferred to OP Chattanooga, Inc., a subsidiary of Tandem Health Care, Inc. Tandem Health Care of Ohio, Inc., is a managing company that provides consulting services to OP Chattanooga, Inc. On April 12, 2004, the Administratrix voluntarily non-suited her claims against Cookeville Long Term Facility, Inc., f/k/a Tandem Health Care of Tennessee, Inc.

probable than not, and within a reasonable degree of medical certainty, that Ms. French died as a result of the infection that had caused her sepsis. It was his opinion that Ms. French suffered from Stage IV pressure ulcers when she was admitted to Erlanger, including an ulcer on her sacrum which was so severe as to expose the bones of her spinal column. According to Dr. Tilley, these ulcers became severely infected, giving off a foul odor, and had become necrotic, meaning that the cells and tissues surrounding the ulcers had died. Dr. Tilley and Nurse Teresa Lowery, the Administratrix's nursing expert, testified that these infections and, correspondingly, Ms. French's death, were caused by the Defendant's failure to provide the basic care that her condition required.

Dr. David Cifu, the Chairman of the Department of Physical Medicine and Rehabilitation at Virginia Commonwealth University and also the medical director at several rehabilitation facilities in Virginia, offered testimony on behalf of the Defendants. Dr. Cifu acknowledged that Ms. French suffered from infections upon her admission to Erlanger. Based on a lack of definitive evidence, however, it was his opinion that Ms. French's death was not the result of sepsis. Dr. Cifu concluded that Ms. French died of respiratory arrest or a failure of pulmonary function as a result of the aggressive methods used by Erlanger while attempting to resuscitate her. His assessment was that Ms. French had become overly hydrated from the excessive fluids she received at Erlanger. It was also Dr. Cifu's opinion that Ms. French was neither abused nor neglected at the Stratford House and that she had received adequate care and treatment at that facility.

The Administratrix introduced the deposition testimony of several nurses' aides (Certified Nursing Assistants, or CNAs) who had been employed at the Stratford House, some of whom confirmed that they had treated Ms. French while she was a patient there. A summary of the allegations contained in the various depositions is as follows:

(1) The CNAs provided most of the hands-on basic care at the Stratford House, including feeding the residents, providing them with water and encouraging them to drink, bathing them, cleaning them and changing the pads underneath them after periods of incontinence, and turning and repositioning them.

(2) The CNAs understood that this basic care was necessary to maintain the health of the residents and to prevent, among other things, the development of pressure ulcers.

(3) Understaffing at the Stratford House prevented the CNAs from performing basic care for the residents in a timely fashion.

(4) Understaffing was caused by the nursing home administrators' failure to allocate sufficient funds for staff in order to avoid "cut[ting] into . . . bonuses" that were based on

-4-

bottom-line profitability.

(5) As a result of understaffing and the lack of timely basic care, residents were sometimes left to lie in their own urine, which caused dried, brown rings on the bed sheets, and feces, which, after drying, were difficult to remove. Multiple pads were used as an alternative to changing a single wet pad.

(6) Martha French was not turned and repositioned as needed and was found languishing in her own urine for so long that it had dried on her bed sheets. Although Ms. French would eat and drink when encouraged to do so, the CNAs often did not have the necessary time to feed her or administer fluids. Further, they did not have time to reposition Ms. French as needed.

(7) The Defendants were aware of the shortage of caregivers at the Stratford House. Stephania Williams, Stratford House's staffing coordinator, testified to chronic staff shortages. Other CNAs stated that they regularly reported staff shortages to supervisors, including the director of nursing and the administrator.

(8) During surveys by state inspectors, Stratford House administration would increase staff, thereby improving resident care, but only temporarily.

(9) CNAs observed "blanks" in charts and found that charts were periodically filled in ahead of time, even though accurate charting was important. One CNA, Michelle Hogan, testified that a secretary "would take all the ADLs (charts for activities of daily living) that were not filled out and she would just fill them out so that they were all complete."[5]

(10) Because of the dissatisfaction among employees working in the laundry, towels and sheets, for a period of time, were not timely washed.

The Defendants filed several motions for partial summary judgment, listing a variety of grounds for relief. The Administratrix filed responses on behalf of the estate. Both parties filed statements of material facts. On October 11, 2006, the trial court concluded that "the gravamen of this action sounds in medical malpractice, this cause is controlled by the [TMMA], and the allegations concerning the [TAPA] are dismissed, summary judgment being granted for defendants on these allegations." Later, on May 17, 2007, the trial court also granted summary judgment as to the punitive damages claim, determining that there was

---

[5] Dr. David Winters, Ms. French's treating physician at the Stratford House, relied upon the accuracy of her chart, which indicated that she had been turned every two hours and fed properly, for his determination that the pressure ulcers she developed were unavoidable.

no evidence in the record that the Defendants had acted intentionally, recklessly, maliciously, or fraudulently. On September 20, 2007, the court denied the Administratrix's motions to reconsider the orders granting partial summary judgment but granted her alternative motion to enter a final judgment on all partial summary judgment rulings pursuant to Tennessee Rule of Civil Procedure 54.02.[6] Four days later, the Administratrix filed her notice of appeal.

The Eastern Section of the Court of Appeals affirmed the trial court's ruling in part, holding that the "gravamen of the case sounds in medical malpractice," classifying the ordinary negligence claims as medical malpractice claims, and dismissing the negligence per se and TAPA claims. Estate of French v. Stratford House, No. E2008-00539-COA-R3-CV, 2009 WL 211898, at *8 (Tenn. Ct. App. Jan. 29, 2009). The Court of Appeals, however, reversed the trial court's grant of summary judgment with regard to punitive damages, concluding that "the trial court prematurely considered the sufficiency of the nonmoving party's evidence when the moving party had failed to make any showing that would shift the burden of production to the [Plaintiff]." Id. at *11.

Recently, the Middle Section of the Court of Appeals reached a different result under similar circumstances, distinguishing between claims against a nursing home sounding in ordinary negligence and those constituting medical malpractice. See Smartt v. NHC Healthcare/McMinnville, LLC, No. M2007-02026-COA-R3-CV, 2009 WL 482475 (Tenn. Ct. App. Feb. 24, 2009). This Court, in an effort to secure uniformity in the treatment of this and other comparable cases, granted an application for permission to appeal pursuant to Tennessee Rule of Appellate Procedure 11.

**Standard of Review and Statutory Interpretation**

The scope of review of a grant of summary judgment is well-established. Because our inquiry involves a question of law, no presumption of correctness attaches to the judgment, and our task is to review the record to determine whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. Hunter v. Brown, 955 S.W.2d 49, 50-51 (Tenn. 1997); Cowden v. Sovran Bank/Cent. S., 816 S.W.2d 741, 744 (Tenn. 1991).

A summary judgment may be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04;

---

[6] "When more than one claim for relief is present in an action . . . the court . . . may direct the entry of a final judgment as to one or more but fewer than all of the claims . . . only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Tenn. R. Civ. P. 54.02. In its order certifying as final the grant of partial summary judgment on all claims except for the medical malpractice claims, the trial court found that "permitting these issues to be reviewed on appeal before trial, if the Court of Appeals finds this an appropriate case for review, would be in the best interest of all parties and in the interest of judicial economy."

Hannan v. Alltel Publ'g Co., 270 S.W.3d 1, 5 (Tenn. 2008); Byrd v. Hall, 847 S.W.2d 208, 214 (Tenn. 1993). The party seeking the summary judgment has the ultimate burden of persuading the court "that there are no disputed, material facts creating a genuine issue for trial . . . and that he is entitled to judgment as a matter of law." Byrd, 847 S.W.2d at 215. If that motion is properly supported, then the burden of production to establish a genuine issue of material fact shifts to the non-moving party. Hannan, 270 S.W.3d at 5. In order to shift the burden of production, the movant must either affirmatively negate an essential element of the nonmovant's claim or demonstrate that the non-moving party cannot establish an essential element of his claim at trial. Id. at 8-9. The court must accept the facts presented by the nonmovant as true and resolve any doubts regarding the existence of genuine issue of material fact in the nonmovant's favor. Martin v. Norfolk S. Ry. Co., 271 S.W.3d 76, 84 (Tenn. 2008). At the summary judgment phase, "it is not the role of a trial or appellate court to weigh the evidence or substitute its judgment for that of the trier of fact." Id. at 87 (citing Byrd, 847 S.W.2d at 211).

This appeal also involves the interpretation of statutes. Statutory construction is a question of law that is reviewed de novo without any presumption of correctness. In re Estate of Tanner, 295 S.W.3d 610, 613 (Tenn. 2009). When dealing with statutory interpretation, well-defined precepts apply. Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 836 (Tenn. 2008). Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. Houghton v. Aramark Educ. Res., Inc., 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. In re C.K.G., 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. Eastman Chem. Co. v. Johnson, 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. Abels ex rel. Hunt v. Genie Indus., Inc., 202 S.W.3d 99, 102 (Tenn. 2006). When a statute is ambiguous, however, we may refer to the broader statutory scheme, the history of the legislation, or other sources to discern its meaning. Colonial Pipeline, 263 S.W.3d at 836. Courts must presume that a legislative body was aware of its prior enactments and knew the state of the law at the time it passed the legislation. Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995).

**Analysis**
**I. Ordinary Negligence/Medical Malpractice Claims**
Our first task is to determine whether the Administratix's claims are based upon ordinary common law negligence, medical malpractice, or both. The elements of common law negligence include "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." Giggers v. Memphis Hous. Auth., 277

S.W.3d 359, 364 (Tenn. 2009) (quoting McCall v. Wilder, 913 S.W.2d 150, 153 (Tenn. 1995)). Medical malpractice claims are governed by the TMMA, which in great measure has codified the elements of common law negligence. See Gunter v. Lab. Corp. of Am., 121 S.W.3d 636, 639 (Tenn. 2003); Kilpatrick v. Bryant, 868 S.W.2d 594, 598 (Tenn. 1993). In order to prevail on a claim of medical malpractice, a plaintiff must establish the following statutory elements: (1) the recognized standard of professional care in the specialty and locality in which the defendant practices; (2) that the defendant failed to act in accordance with the applicable standard of care; and (3) that as proximate result of the defendant's negligent act or omission, the claimant suffered an injury which otherwise would not have occurred. Tenn. Code Ann. § 29-26-115(a).[7]

Whether claims are characterized as ordinary negligence or medical malpractice affects the nature of the litigation. A medical malpractice claimant must establish the statutory elements through the testimony of an expert who meets the qualifications set forth in Tennessee Code Annotated section 29-26-115(b). See Barkes v. River Park Hosp., Inc., ___ S.W.3d ___, ___, 2010 WL 4117151, at *4 n.2 (Tenn. Oct. 20, 2010) ("Unless the negligence is obvious and readily understandable by an average layperson, expert testimony will be required to demonstrate the applicable standard of care and breach of that standard."); Seavers v. Methodist Med. Ctr. of Oak Ridge, 9 S.W.3d 86, 92 (Tenn. 1999) ("Expert testimony is required in medical malpractice cases to assist and to educate the trier of fact unless the alleged malpractice lies within the common knowledge of lay persons."). There is no such requirement for an ordinary negligence claim. Moreover, a potential medical malpractice claimant is required to provide written notice of his or her claim to the health care provider at least sixty days before filing the complaint. Tenn. Code Ann. § 29-26-121(a)(1). Although a trial court may excuse compliance with this provision "for extraordinary cause shown," Tenn. Code Ann. § 29-26-121(b), no such notice is required for

---

[7] Section 29-26-115(a) provides:

In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

a claim based upon ordinary negligence.

Because medical malpractice is a category of negligence, the distinction between medical malpractice and negligence claims is subtle; there is no rigid analytical line separating the two causes of action. Draper v. Westerfield, 181 S.W.3d 283, 290 (Tenn. 2005); Gunter, 121 S.W.3d at 639 (quoting Weiner v. Lenox Hill Hosp., 673 N.E.2d 914, 916 (N.Y. 1996)). In Gunter, a suit involving allegations of negligence by a laboratory with regard to a paternity test, this Court observed that the distinguishing feature between ordinary negligence and medical malpractice cases is whether "a plaintiff's claim is for injuries resulting from negligent medical treatment." 121 S.W.3d at 640. We embraced the standard set forth by the New York courts for distinguishing an ordinary negligence claim from one based upon medical malpractice:

> [W]hen a claim alleges negligent conduct which constitutes or bears a substantial relationship to the rendition of medical treatment by a medical professional, the medical malpractice statute is applicable. Conversely, when the conduct alleged is not substantially related to the rendition of medical treatment by a medical professional, the medical malpractice statute does not apply.

Id. at 641. "The physician-patient relationship is an essential element of a cause of action for medical malpractice, but not for common law negligence." Pittman v. Upjohn Co., 890 S.W.2d 425, 431 (Tenn. 1994); see also Bradshaw v. Daniel, 854 S.W.2d 865, 870 (Tenn. 1993). Not all cases involving health or medical care automatically qualify as medical malpractice claims, see Pullins v. Fentress Cnty. Gen. Hosp., 594 S.W.2d 663, 669 (Tenn. 1979), and physicians may be exposed to liability to non-patients under ordinary negligence principles. Bradshaw, 854 S.W.2d at 870; Wharton Transp. Corp. v. Bridges, 606 S.W.2d 521, 526 (Tenn. 1980). Moreover, the medical malpractice statute may apply to non-physicians if they are involved in the medical treatment of patients. Gunter, 121 S.W.3d at 640.

Our Court of Appeals has further defined the standard that we set forth in Gunter and reaffirmed in Draper:

> Medical malpractice cases typically involve a medical diagnosis, treatment or other scientific matters. The distinction between ordinary negligence and malpractice turns on whether the acts or omissions complained of involve a matter of medical science or art requiring specialized skills not ordinarily possessed by lay persons or whether the conduct complained of can instead be assessed on the basis of common everyday experience of the trier of fact.

Peete v. Shelby Cnty. Health Care Corp., 938 S.W.2d 693, 696 (Tenn. Ct. App. 1996) (quoting Graniger v. Methodist Hosp. Healthcare Sys., No. 02A01-9303-CV-00201, 1994 WL 496781, at *3 (Tenn. Ct. App. Sept. 9, 1994)). If the alleged breach of the duty of care set forth in the complaint is one that was based upon medical art or science, training, or expertise, then it is a claim for medical malpractice. If, however, the act or omission complained of is one that requires no specialized skills, and could be assessed by the trier of fact based on ordinary everyday experiences, then the claim sounds in ordinary negligence. See Conley v. Life Care Ctrs. of Am., Inc., 236 S.W.3d 713, 729-30 (Tenn. Ct. App. 2007).[8] Of course, making that distinction is not always an easy task.

In both Gunter and Draper, this Court determined that the claims were based in common law negligence, not medical malpractice. See Draper, 181 S.W.3d at 291 (holding that radiologist's failure to provide information regarding child abuse to investigators formed the basis for an ordinary negligence claim); Gunter, 121 S.W.3d at 641 (concluding that claim concerning adequacy of laboratory's blood testing procedures was one for common law negligence). The determination of whether claims should be characterized as ordinary negligence or medical malpractice claims obviously depends heavily on the facts of each individual case. It is not surprising, therefore, that our Court of Appeals, by use of the same standard, has reached different conclusions based on the different facts of the cases before it, holding in some instances that the allegations sound in medical malpractice[9] and in others

---

[8] Courts in jurisdictions other than New York and Tennessee appear to have developed a similar standard for determining whether a plaintiff's claims sound in ordinary negligence or medical malpractice. See, e.g., Gold v. Greenwich Hosp. Ass'n, 811 A.2d 1266, 1270 (Conn. 2002); Coleman v. Deno, 813 So. 2d 303, 315-16 (La. 2002); Bryant v. Oakpointe Villa Nursing Ctr., 684 N.W.2d 864, 871 (Mich. 2004).

[9] See, e.g., Wheelock v. Doers, No. E2009-01968-COA-R3-CV, 2010 WL 3564422, at *6 (Tenn. Ct. App. Sept. 14, 2010) (holding that claim nursing staff erred in moving decedent and failing to administer CPR after surgery sounded in medical malpractice); Long v. Hillcrest Healthcare-West, No. E2009-01405-COA-R3-CV, 2010 WL 1526065, at *3 (Tenn. Ct. App. Apr. 16, 2010) (determining that claims decedent was not provided special handling required by her condition and doctor's orders regarding care were not followed were ones for medical malpractice); Johnsey v. Northbrooke Manor, Inc., No. W2008-01118-COA-R3-CV, 2009 WL 1349202, at *14 (Tenn. Ct. App. May 14, 2009) (concluding that nursing home's alleged failure to prevent decedent from falling and breaking his hip and to timely report the injury were medical malpractice claims); Cannon v. McKendree Village, Inc., 295 S.W.3d 278, 283 (Tenn. Ct. App. 2008) (determining that nursing home's alleged error of not restraining decedent in her bed by physical or chemical means was a medical malpractice claim); Conley, 236 S.W.3d at 731 (holding that allegation nursing home improperly admitted and retained resident who assaulted decedent, a co-resident, sounded in medical malpractice); Howard v. Kindred Nursing Ctrs. Ltd. P'ship, No. W2005-02360-COA-R3-CV, 2006 WL 2136466, at *5 (Tenn. Ct. App. Aug. 2, 2006) (concluding that allegation nurses and hospital staff failed to adequately care for decedent was one of medical malpractice).

that at least some of the claims sound in ordinary negligence.[10]

In determining the appropriate statute of limitations to apply in a particular cause of action, this Court has considered "the gravamen of the complaint." Whaley v. Perkins, 197 S.W.3d 665, 670 (Tenn. 2006) (quoting Gunter, 121 S.W.3d at 638). The "gravamen" of a complaint is its "substantial point or essence." Black's Law Dictionary 770 (9th ed. 2009). In recent years, our Court of Appeals appears to have increasingly applied the TMMA to borderline claims by concluding that the gravamen of the complaint is medical malpractice. See, e.g., Conley, 236 S.W.3d at 736; Howard, 2006 WL 2136466, at *5. In this instance, the trial court understandably used that approach, and the Court of Appeals affirmed the rationale. Estate of French, 2009 WL 211898, at *8.

It is, of course, the responsibility of the courts to ascertain the nature and substance of a claim. The designation given those claims by either the plaintiff or the defendant is not determinative. For example, even though the Administratrix in this case made reference to neither the TMMA nor the term "medical malpractice" in the complaint, the requirements of the TMMA apply if, in fact, the factual basis for the claim sounds in medical malpractice. Nevertheless, a single complaint may be founded upon both ordinary negligence principles and the medical malpractice statute. The TMMA applies only to those alleged acts that bear a substantial relationship to the rendition of medical treatment by a medical professional, or concern medical art or science, training, or expertise. If there are additional acts or omissions alleged that do not bear a substantial relationship to medical treatment, require no specialized skills, or could be assessed by the trier of fact based upon ordinary everyday experiences, then the claims may be made under an ordinary negligence theory.

A recent opinion by the Court of Appeals, Smartt v. NHC Healthcare/McMinnville, LLC, is instructive. In Smartt, the representative of a deceased nursing home resident filed suit against the nursing home and its related entities seeking damages for injuries the resident

---

[10] See, e.g., Smartt, 2009 WL 482475, at *9-10 (holding that complaint alleging nursing home was negligent with regard to both "custodial services" and "skilled nursing services" included both ordinary negligence and medical malpractice claims); Turner v. Steriltek, Inc., No. M2006-01816-COA-R3-CV, 2007 WL 4523157, at *8 (Tenn. Ct. App. Dec. 20, 2007) (determining that alleged error by doctors and hospital in not ensuring surgical instruments were sterilized prior to procedure sounded in ordinary negligence); Estate of Doe v. Vanderbilt Univ., 958 S.W.2d 117, 121, 122-23 (Tenn. Ct. App. 1997) (concluding that suit was one for ordinary negligence when complaint alleged hospital failed to notify recipients of blood transfusion prior to certain date that blood they received was not tested for HIV); Peete, 938 S.W.2d at 696 (holding that allegation orthopedic suspension bar above hospital bed fell and struck patient in the head sounded in ordinary negligence); Franklin v. Collins Chapel Connectional Hosp., 696 S.W.2d 16, 20 (Tenn. Ct. App. 1985) (determining that suit claiming that decedent was scalded while being bathed by nursing home orderly should be adjudicated pursuant to common law negligence principles).

had sustained during his stay there. 2009 WL 482475, at *1. The Court of Appeals classified some of the allegations as pertaining to "skilled nursing services" that the decedent had received at the nursing home. Id. at *9. This care was "aimed at diagnosing, treating, and preventing injuries and illnesses . . .; functions which require a degree of medical expertise." Id. The other claims concerned "'custodial services' such as bathing, feeding, grooming, etc.; functions that the plaintiffs could have provided themselves." Id. The Court of Appeals, observing that "[t]here is a distinction between acts constituting ordinary negligence and those constituting medical malpractice," affirmed the trial court's decision to submit instructions to the jury on both causes of action. Id. at *10; see also Long, 2010 WL 1526065, at *4 (Susano, J., dissenting) (interpreting complaint as including both medical malpractice claims and ordinary negligence claims that did not "require[] any specialized medical knowledge").

As in Smartt, the allegations in this case can be separated into acts and omissions constituting medical malpractice and acts and omissions constituting ordinary negligence. Claims regarding the "evaluation of how a particular patient needs to be fed or hydrated, whether the patient is at risk for pressure sores, how often an at-risk patient needs to be turned, [and] how to treat pressure ulcers if they develop," as properly categorized by the Court of Appeals, fall under the guise of a medical diagnosis requiring specialized skills and training. Estate of French, 2009 WL 211898, at *8. As such, the claims by the Administratix that Stratford House was negligent in assessing Ms. French's condition, developing her initial plan of care, and properly updating that plan to conform to changes in her condition do indeed sound in medical malpractice. The Administratix, however, also asserts that the staff at the Stratford House failed to administer basic care in compliance with both the established care plan and doctors' subsequent orders regarding Ms. French's treatment. Moreover, those staff members who allegedly failed to follow the care plan were CNAs. While CNAs are required to receive a course of training that is regulated by the state, they are not medical professionals and their qualifications do not approach the more extensive and specialized training of a doctor or registered nurse.[11] The Administratrix claims that the failure of the CNAs to provide basic services resulted, at least in part, from chronic understaffing of which senior management at the Stratford House was aware. In our assessment, these alleged acts and omissions pertain to basic care and do not substantially relate to the rendition of medical treatment by a medical professional. Because no specialized medical skill is required to

_____

[11] The terms "certified nursing assistant" and "nurse aide" are synonymous. The State of Tennessee requires a nurse aide training program to consist of at least seventy-five hours of instruction by a registered nurse with at least two years' experience, one of which must be in long-term care. Prior to any direct contact with nursing home residents, the program requires sixteen hours of training in communication and interpersonal skills, residents' rights, residents' independence, safety and emergency procedures, and infection control. See Tennessee Department of Health, http://health.state.tn.us/hcf/nurseaide.htm (last visited Jan. 11, 2011).

perform those tasks, the trier of fact could assess the merits of the claim based upon everyday experiences. Thus, this component of the claim sounds in ordinary negligence.[12]

The care plan developed for Ms. French upon her admission to the Stratford House, which has been made part of the record, illustrates the dichotomy between a medical malpractice claim and an ordinary negligence claim. The plan, which acknowledged Ms. French's impaired physical mobility, establishes the goal of keeping her skin "free from irritation and breakdown," and sets forth specific instructions designed to achieve that objective. These instructions include turning and repositioning Ms. French every two hours, using pressure-relieving measures, keeping her skin dry and clean, and assessing her skin condition over bony areas for early signs of breakdown. The Administratrix's assertion that the initial assessment of Ms. French's condition and the plan of treatment fell short of the Stratford House's duty of care to its patient, thereby causing her injuries, is subject to the requirements of the TMMA. In contrast, allegations that the CNAs failed to comply with the care plan's instructions due to a lack of training, understaffing, or other causes, constitute claims of ordinary, common law negligence.[13]

The Wisconsin Supreme Court expressed a similar view: "'If the patient requires professional nursing or professional hospital care, then expert testimony as to the standard of that type of care is necessary.' However, if the patient requires nonmedical, administrative, ministerial or routine care, the standard of care need not be established by expert testimony." Kujawski v. Arbor View Health Care Ctr., 407 N.W.2d 249, 252 (Wis. 1987) (quoting Cramer v. Theda Clark Mem. Hosp., 172 N.W.2d 427, 428 (Wis. 1969)). Several other jurisdictions have approved of the language used in Cramer, holding that

---

[12] Our decision should not be construed as holding that services provided by CNAs can never be subject to the TMMA. To the contrary, as we have stated, the TMMA may apply to non-physicians such as CNAs if they are involved in the medical treatment of patients. We simply disagree with the dissent that the alleged acts and omissions of the CNAs, as set forth in the complaint in this case, are "substantially related to the rendition of medical treatment by a medical professional." Gunter, 121 S.W.3d at 641.

[13] At least one Court of Appeals decision has stated that a relevant factor in comparing ordinary negligence with medical malpractice should be "whether the defendant's acts or omissions relate to a particular patient or to an entire group of persons." Turner, 2007 WL 4523157, at *5 (citing Estate of Doe, 958 S.W.2d at 121); see also Hill v. Sun Healthcare Grp., Inc., No. 1:08-cv-1307, 2009 WL 2058809, at *5 (W.D. Tenn. July 8, 2009) (determining that "[s]everal of the allegations, such as negligent hiring and failure to supervise employees," should not be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because they "plausibly could be either related or unrelated to medical treatment"). We agree that this is a relevant factor to consider in determining whether the act or omission involved a medical diagnosis or required specialized training in the medical arts and sciences. Of course, it is well-established in Tennessee that healthcare providers may be directly liable to patients independent of any liability based on the provider's employees or agents. See Barkes, ___ S.W.3d at ___, 2010 WL 4117151, at *3.

-13-

claims concerning basic care sound in ordinary negligence rather than medical malpractice. The Alabama Supreme Court, for example, held that a nurse's failure to respond to a patient's call for assistance "clearly f[ell] within the category of routine hospital care," and thus the claim arising from the act was one of negligence, not medical malpractice. Ex parte HealthSouth Corp., 851 So.2d 33, 39 (Ala. 2002) ("A jury could use 'common knowledge and experience' to determine whether the standard of care was breached in this case, where custodial care, not medical care, is at issue."). Similarly, the West Virginia Supreme Court held that expert testimony was not required in a suit brought for injuries suffered when the plaintiff fell out of his hospital bed, because the failure to monitor him constituted routine care. McGraw v. St. Joseph's Hosp., 488 S.E.2d 389, 396 (W. Va. 1997). Other courts have similarly held that expert testimony is not required when the care out of which the claims arose was "'administrative,' 'ministerial,' 'routine,' or the like, as distinguished from medical or professional." Bennett v. Winthrop Cmty. Hosp., 489 N.E.2d 1032, 1035 (Mass. App. Ct. 1986); see also Kastler v. Iowa Methodist Hosp., 193 N.W.2d 98, 101 (Iowa 1971); Golden Villa Nursing Home, Inc. v. Smith, 674 S.W.2d 343, 349 (Tex. App. 1984).

In summary, not all care given to patients at nursing home facilities is necessarily related to the rendering of medical care by a medical professional. The assessment of a patient's condition and the development of a plan of care that determines how often and when a patient needs to be fed, hydrated, bathed, turned, or repositioned may require specialized medical skills, and thus should proceed under the TMMA. A nursing home's failure to ensure that its staff, including certified nursing assistants, actually complies with the plan of care and performs services that, however necessary, are routine and nonmedical in nature, falls into the category of ordinary negligence.[14] Because this complaint and the supporting evidence suggests that both types of claims are present, summary judgment on the ordinary negligence claim is not appropriate. On remand, the trial court shall submit both causes of action to the jury for its consideration and instruct the jury accordingly.

## II. Negligence Per Se Claims

In addition to the claims for ordinary negligence and medical malpractice, the Administratix alleges negligence per se based upon violations of certain federal and state nursing home regulations. Specifically, the Administratix claims that the Defendants breached their duty of care to Ms. French by failing "[t]o comply with all standards of care required by the Federal Regulations, 42 CFR 483.10 *et seq*, including, but not limited to"

---

[14] The dissent would characterize both the development of Ms. French's plan of care by medical professionals and the routine care provided by other nursing home staff as "substantially related to medical treatment." Our TMMA, and the cases interpreting it, require a more nuanced approach. That the Administratrix is prepared to offer expert testimony in support of her allegations is of no relevance to our analysis.

nineteen enumerated but uncited standards, and also by failing "[t]o comply with all standards of care required by the Nursing Home Regulations of the Tennessee Department of Health, *Rules of the Tennessee Department of Health Board for Licensing Health Care Facilities*, Chapter 1200-8-6, *et seq*, including, but not limited to, Standards 1200-8-6.05, 1200-8-6-.06, 1200-8-6-.12 and 1200-8-6-.15." The Court of Appeals, having affirmed the trial court's holding that all of the claims in the complaint sounded in medical malpractice, "refuse[d] to use the federal regulations of nursing homes, or the state regulations based upon them, to create a cause of action separate and apart from a medical malpractice action." Estate of French, 2009 WL 211898, at *10.

This Court has summarized the doctrine of negligence per se as follows:

> The standard of conduct expected of a reasonable person may be prescribed in a statute and, consequently, a violation of the statute may be deemed to be negligence per se. When a statute provides that under certain circumstances particular acts shall or shall not be done, it may be interpreted as fixing a standard of care . . . from which it is negligence to deviate. In order to establish negligence per se, it must be shown that the statute violated was designed to impose a duty or prohibit an act for the benefit of a person or the public. It must also be established that the injured party was within the class of persons that the statute was meant to protect.

Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc., 878 S.W.2d 934, 937 (Tenn. 1994) (citations omitted). "'Not every statutory violation amounts to negligence per se. . . . [T]he courts must ultimately decide whether they will adopt a statutory standard to define the standard of conduct of reasonable persons in specific circumstances.'" Whaley, 197 S.W.3d at 673 (quoting Rains v. Bend of the River, 124 S.W.3d 580, 590-91 (Tenn. Ct. App. 2003)). The negligence per se doctrine may also be applied based upon violations of regulations or ordinances, as well as statutes. See id. at 672-73.

The Court of Appeals followed the rationale set forth in Conley, another case in which the plaintiff had asserted negligence per se based upon the federal nursing home regulations found in 42 C.F.R. § 483. See 236 S.W.3d at 732-33. In Conley, the court had rejected the negligence per se theory of recovery for two reasons. Initially, "[t]he federal regulations are simply too vague and general to constitute a standard of care by which a jury, or for that matter a court, can effectively judge the acts or omissions of health care providers and nursing home operators." Id. at 733. Further, the "claims that are based upon alleged violations of federal regulatory standards constitute a national standard of care that runs afoul [of] the" TMMA, and, more specifically, its "locality rule." Id. at 733-34.

As to the case before us, the Court of Appeals properly ruled that a negligence per se claim cannot co-exist with a medical malpractice claim. The Administratix may not, therefore, use the alleged violations of the federal and state regulations to prove a deviation in the standard of care as a component of the medical malpractice claim. There are good reasons for our conclusion.

First, the effect of declaring conduct negligent per se is to hold that conduct is negligent as a matter of law, thus requiring plaintiffs to prove only proximate and actual causation and damages. See Rains, 124 S.W.3d at 590. This conflicts with the TMMA's instruction that "there shall be no presumption of negligence on the part of the defendant" in a medical malpractice action except in cases where the res ipsa loquitur doctrine applies. Tenn. Code Ann. § 29-26-115(c) ("[T]here shall be a rebuttable presumption that the defendant was negligent where it is shown by the proof that the instrumentality causing injury was in the defendant's (or defendants') exclusive control and that the accident or injury was one which ordinarily doesn't occur in the absence of negligence."). In light of the statutory restriction against presumptions of negligence in Tennessee Code Annotated section 29-26-115(c), some courts have taken the position that negligence per se claims cannot be asserted in medical malpractice cases that do not invoke res ipsa loquitur doctrine. See Brown v. Sun Healthcare Grp., Inc., 476 F. Supp. 2d 848, 852 (E.D. Tenn. 2007); Latiff v. Dobbs, No. E2006-02395-COA-R3-CV, 2008 WL 238444, at *14 & n.6 (Tenn. Ct. App. Jan. 29, 2008). We agree with this rationale.

Second, a finding of negligence per se based upon federal and state nursing home regulations would be inconsistent with our General Assembly's directive that the relevant standard of care for a medical malpractice claim is that existing "in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred." Tenn. Code Ann. § 29-26-115(a)(1); see also Tenn. Code Ann. § 29-26-115(b) (providing that an expert is only competent to testify regarding the standard of care if he or she is "licensed to practice in the state or a contiguous border state" and has practiced in one of the states during the year preceding the injury). In order to prove a violation of the TMMA, a plaintiff must show that his or her injuries resulted because "the defendant failed to act with ordinary and reasonable care when compared to the customs or practices of physicians from a particular geographic region." Sutphin v. Platt, 720 S.W.2d 455, 457 (Tenn. 1986). In consequence, the locality rule, which the legislature intended to apply to private causes of action for medical malpractice, precludes plaintiffs from proceeding on a negligence per se theory based upon alleged violations of nursing home regulations. See Conley, 236 S.W.3d at 734 (quoting Sutphin, 720 S.W.2d at 457 ("The United States of America fails to qualify as 'a particular geographic region.'")); Hawkins v. Hendersonville Operating Co., 690 S.E.2d 35, 40 (N.C. Ct. App. 2010) (affirming the exclusion of expert testimony regarding the standard of care under federal nursing home regulations, because to

admit it would violate the locality rule in North Carolina medical malpractice actions).

Because not all of the Administratrix's claims sound in medical malpractice, however, this case is distinguishable from Conley, in which the Court of Appeals concluded that the TMMA was the exclusive remedy. We must determine, therefore, whether the Administratrix may proceed on a negligence per se theory in support of her claims of ordinary negligence. The two prerequisites for a negligence per se claim are present here: Ms. French belonged to the class of persons the federal and state nursing home regulations were designed to protect, and her injuries were the type that the regulations were designed to prevent. See Whaley, 197 S.W.3d at 673 (quoting Rains, 124 S.W.3d at 591). This does not end our inquiry, however, as to the viability of a negligence per se claim. Rains, 124 S.W.3d at 591. Other factors apply, including, but not limited to, (1) the nature of the legislative provision; (2) the adequacy of existing remedies; (3) the extent to which recognizing a cause of action in negligence per se would aid, supplement, or interfere with existing remedies; (4) the significance of the purpose that the legislative body was seeking to effectuate in the statute, regulation, or ordinance; (5) the extent of the change in tort law that would result from recognizing the action; and (6) the burden that the new cause of action would place on the judiciary. Restatement (Second) of Torts § 874A, cmt. h (1979).

By the application of these factors, our conclusion is that a plaintiff pursuing a claim of ordinary negligence against a nursing home may prove negligence per se by offering proof that the nursing home violated relevant federal and state regulations. The nature of the regulations cited in the complaint suggests that they are directed to obviate the very injuries that the Administratrix alleges to have been suffered by Ms. French. See McCain v. Beverly Health & Rehab. Servs., No. CIV. A. 02-657, 2002 WL 1565526, at *1 (E.D. Pa. July 15, 2002) ("The furtherance of those protective policies is a basis for delineating a nursing home's tortious duty in these circumstances."). For example, the federal and state regulations specifically address measures that long-term care facilities should undertake in an effort to avoid the development of pressure ulcers in patients. See 42 C.F.R. § 483.25(c) (2009); Tenn. Comp. R. & Regs. 1200-8-6-.06(4)(o) (2007). Moreover, permitting proof of violations of the regulations would supplement instead of replace or interfere with the traditional ordinary negligence action. See McLain v. Mariner Health Care, Inc., 632 S.E.2d 435, 438 (Ga. Ct. App. 2006) ("[T]he complaint's allegations of the . . . statutes and regulations would be competent evidence of [the nursing home owner's] breach of duty under a traditional negligence action."). Finally, "[t]he negligence per se doctrine does not create a new cause of action," but "[r]ather . . . is a form of ordinary negligence that enables the courts to use a penal statute to define a reasonably prudent person's standard of care." Rains, 124 S.W.3d at 589 (citations omitted). Thus, permitting plaintiffs to proceed on a negligence per se theory against a nursing home does not burden the judiciary or change our state's tort law in any significant way.

We recognize that an express private right of action was not created under either the Federal Nursing Home Reform Act ("FNHRA")[15] or the corresponding Tennessee act,[16] which establish the rights of residents, patients, and the public with regard to nursing home care. See, e.g., Estate of Hazelton ex rel. Hester v. Cain, 950 So. 2d 231, 235-36 (Miss. Ct. App. 2007) (holding that state nursing home regulations did not create a separate cause of action or establish the duty owed by nursing homes to private litigants). The establishment of a set of licensing requirements for nursing homes and a system of agency prosecution to ensure compliance does not create a new cause of action against nursing homes.[17] As stated, however, our recognition that violations of the regulations may be deemed negligence per se does not create a new cause of action where one does not already exist. We are also mindful of the fact that ordinary negligence actions against nursing homes are classified as such (and are distinct from medical malpractice actions) because they can be assessed based upon ordinary, everyday experiences. Requiring the finder of fact to parse through voluminous regulations to determine the standard of care in an ordinary negligence action against a nursing home may not always be the most direct approach toward the establishment of a nursing home's negligence. Nevertheless, proof of violations of federal and state nursing home regulations is relevant in determining whether a defendant nursing home has breached the standard of care. For the reasons stated, the Administratrix may pursue a negligence per se theory with regard to her ordinary negligence claims based upon alleged violations of federal and state nursing home regulations.

### III. The TAPA Claims

The Tennessee General Assembly enacted the TAPA with the purpose of protecting adults from abuse, neglect, or exploitation. Tenn. Code Ann. § 71-6-101(b)(1). Unlike the statute that sets forth the rights of Tennessee's nursing home residents and patients, the

---

[15] The FNHRA was contained in the Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, §§ 4201-4218 (codified at 42 U.S.C. §§ 1395i-3, 1396r (2003 & Supp. 2010)). See Brogdon v. Nat'l Healthcare Corp., 103 F. Supp. 2d 1322, 1327 (N.D. Ga. 2000). The federal courts are split as to whether Congress created an implied private right of action under the FNHRA. Compare id. at 1330-32 with Joseph S. v. Hogan, 561 F. Supp. 2d 280, 298-304 (E.D.N.Y. 2008).

[16] Act of April 22, 1987, ch. 312, 1987 Tenn. Pub. Acts 612 (codified at Tenn. Code Ann. §§ 68-11-801 to -829 & -901 to -910 (2006)).

[17] Indeed, the scope of the federal regulations in question appears to be limited to determinations regarding whether a facility will be eligible to receive Medicare and Medicaid payments. 42 C.F.R. § 483.1 (2009) ("The provisions of this part contain the requirements that an institution must meet in order to qualify to participate as a [skilled nursing facility] in the Medicare program, and as a nursing facility in the Medicaid program. They serve as the basis for survey activities for the purpose of determining whether a facility meets the requirements for participation in Medicare and Medicaid."). Similarly, the state regulations set forth the standards for nursing homes for purposes of licensing with the state.

TAPA explicitly provides for a right of recovery in a civil action for "adults," as defined by the statute,[18] who have been the victim of "abuse or neglect, sexual abuse or exploitation."[19] Tenn. Code Ann. § 71-6-120(b). "Abuse or neglect" is defined in the statute as:

> [T]he infliction of physical pain, injury, or mental anguish, or the deprivation of services by a caretaker that are necessary to maintain the health and welfare of an adult or a situation in which an adult is unable to provide or obtain the services that are necessary to maintain that person's health or welfare.

Tenn. Code Ann. § 71-6-102(1). Initially, the TAPA cannot be used to provide an additional right of recovery for medical malpractice claims; the statutory requirements "shall not apply to a cause of action within the scope of [the TMMA]," and causes of action within that scope "shall be governed solely by [the TMMA]." Tenn. Code Ann. § 71-6-120(g); see also Cannon, 295 S.W.3d at 284; Conley, 236 S.W.3d at 726. Had all of the Administratrix's negligence claims qualified as based in medical malpractice, the dismissal of the TAPA claim would have been entirely proper. See Estate of French, 2009 WL 211898, at *11. Because there are ordinary negligence claims, however, we must address whether the Administratrix may pursue recovery under the TAPA.

The Administratix and amici briefs argue persuasively that to disallow a private right of recovery under the TAPA for ordinary negligence claims against a nursing home or other health care provider would unduly restrict the scope of that Act. The TAPA includes within its definition of "caretaker" "an individual or institution . . . who has assumed the responsibility for the care of the adult person voluntarily, or by contract, or agreement." Tenn. Code Ann. § 71-6-102(5)(A). Nursing homes or other health care providers are not explicitly excluded from this definition. The Tennessee Association for Justice argues that if the TAPA is not available to protect the frail and elderly from abuses suffered in the nursing home, a place where they are peculiarly at risk, then the TAPA "is virtually useless

---

[18] "'Adult' means a person eighteen (18) years of age or older who because of mental or physical dysfunctioning or advanced age is unable to manage such person's own resources, carry out the activities of daily living, or protect such person from neglect, hazardous or abusive situations without assistance from others and who has no available, willing, and responsibly able person for assistance and who may be in need of protective services . . . ." Tenn. Code Ann. § 71-6-102(2).

[19] The right of recovery under the TAPA extends to a conservator or next friend, and is not abated or extinguished by the death of the qualified adult. Tenn. Code Ann. § 71-6-120(b). Compensatory damages and reasonable costs may be recovered, as may punitive damages in accordance with applicable common law standards. Tenn. Code Ann. § 71-6-120(d)-(e). Attorney's fees may likewise be recovered if it is proven by clear and convincing evidence that the abuse or neglect "resulted from intentional, fraudulent or malicious conduct by the defendant." Tenn. Code Ann. § 71-6-120(d).

and its purpose is unfulfilled." Similarly, Tennessee Citizen Action asserts that the TAPA "should be read to apply to . . . deprivations of ordinary care" even when deprivations of medical care are also at issue in a case. In sum, the Administratrix and amici assert that TAPA was designed to remedy abuse and neglect that might be suffered by adults who reside in nursing homes, even if those claims of abuse and neglect are brought concurrently with claims of medical malpractice to which the TAPA does not apply.

The Defendants' response to these arguments is based exclusively on the Court of Appeals' determination in Cannon and Conley that the TMMA prohibits recovery under the TAPA when the claim sounds in medical malpractice. While the plain language of Tennessee Code Annotated section 71-6-120(g) precludes recovery under the TAPA when a claim is exclusively one for medical malpractice, the statute does not apply to an ordinary negligence claim, even one that is coupled with a medical malpractice claim. The injuries Ms. French suffered, which are alleged to have occurred due to the Defendants' acts of ordinary negligence, are the very types for which our General Assembly intended redress under the TAPA. The Administratrix may, therefore, pursue recovery under the TAPA in relation to her ordinary negligence claims.

### IV. Punitive Damages

One final issue is that of punitive damages. The trial court granted summary judgment to the Defendants on the Administratrix's claim of punitive damages, determining that "the record, taken in the light most favorable to the plaintiff, does not contain" evidence "that the defendants have acted intentionally, recklessly, maliciously, or fraudulently." The Court of Appeals reversed and vacated that part of the trial court's judgment, concluding that the trial court had "prematurely considered the sufficiency of the nonmoving party's evidence [regarding punitive damages] when the moving party had failed to make any showing that would shift the burden of production to the Administratrix." Estate of French, 2009 WL 211898, at *11 (citing Hannan v. Alltel Publ'g Co., 270 S.W.3d 1, 8-9 (Tenn. 2008)). The Defendants do not take issue with the Court of Appeals' determination that the trial court erred in dismissing the punitive damages claims. We, therefore, affirm the Court of Appeals' resolution of the issue.

### Conclusion

Because the complaint includes claims that the Defendants were negligent as to both the medical treatment and the ordinary care that they provided Ms. French, the trial court erred by granting the motion for partial summary judgment on the grounds that the gravamen of the complaint sounded in medical malpractice. Moreover, the Administratrix may pursue recovery under a negligence per se theory and the TAPA for her claims based upon ordinary negligence. We affirm the Court of Appeals on the punitive damages issue. The cause is remanded to the trial court for proceedings consistent with this opinion. The costs of this

-20-

appeal are taxed one-half to the Administratix, Kimberly French, and one-half to the Defendants, the Stratford House, OP Chattanooga, Inc., Tandem Health Care, Inc., Tandem Health Care of Ohio, Inc., HP/Stratford House, Inc., and HP/Holding, Inc., for which execution shall issue if necessary.

_____
GARY R. WADE, JUSTICE