# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 24, 2016 Session

## CATHERINE CRIGHT v. TIJUAN OVERLY, M.D. ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 2-9-14      William T. Ailor, Judge**

_____

### No. E2015-01215-COA-R3-CV-FILED-OCTOBER 17, 2016
_____

Catherine Cright's husband passed away on August 4, 2008, due to complications arising from a stent placement procedure. Cright[1] subsequently filed a medical malpractice action[2] against Dr. Tijuan Overly, Knoxville Cardiovascular Group, P.C. (KCG), and University Health Systems, Inc. (UHS) (collectively the defendants). Cright nonsuited that action in April 2013 three days into trial. She later sent a notice letter to each of the defendants advising them of her intent to refile her action. She neglected to attach a HIPAA-compliant medical authorization. Thereafter, Cright refiled her complaint against the defendants, all of whom filed a motion to dismiss because of her failure to comply with the HIPAA-compliant authorization requirement set forth in Tenn. Code Ann. § 29-26-121(a) (Supp. 2009). The trial court granted the motions. Cright appeals. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KENNY ARMSTRONG, JJ., joined.

Donna K. Holt, Knoxville, Tennessee, for the appellant, Catherine Cright.

James H. London, Heidi A. Barcus, and J. Spencer Fair, Knoxville, Tennessee, for the appellees, Tjuan L. Overly, M.D., and Knoxville Cardiovascular Group, P.C., dba University Cardiology.

---

[1] When we refer to "Cright," we are referring to Mrs. Cright.

[2] Now referred to by statute as a "health care liability action." Since this case was filed when the term "medical malpractice" was still in effect, we will use that phrase throughout this opinion.

Stephen C. Daves, Jeffrey R. Thompson, and Gina C. Sarli, Knoxville, Tennessee, for the appellee, University Health System, Inc., doing business as University of Tennessee Medical Center.

**OPINION**

**I.**

On July 28, 2008, Dr. Overly performed a stent placement procedure on the deceased at the University of Tennessee Medical Center (UTMC). During the course of the procedure, Dr. Overly used the deceased's femoral artery as an access route when placing the stent. The deceased was kept overnight for observation. The following morning, Dr. Overly visited with the deceased and wrote the order for his discharge. However, the discharge was delayed and eventually cancelled after the deceased experienced blood pressure fluctuations, had groin pain, and was unable to urinate. Dr. Overly was notified of these changes and told the attending nurse to give the deceased medication and a fluid bolus. In addition, Dr. Overly requested that the deceased see a urologist. As a result, the Chief Resident of Urology at UTMC examined the deceased and ordered bladder fluid measurements and, depending on those measurements, placement of a catheter. Once the fluid measurements were taken, a nurse inserted a catheter into the deceased. Thereafter, a junior urology resident administered a cystoscopy, which revealed that the deceased had a bladder mass. The catheter was reinserted.

The deceased continued experiencing pain, and the junior urology resident prescribed pain medication. The Chief Resident of Urology was contacted and ordered a CT scan of the deceased's abdomen to determine if his bladder had been injured during the cystoscopy. The CT scan revealed that the deceased had suffered a retroperitoneal hemorrhage. A nurse ordered a complete blood count (CBC) for the deceased. A few hours later, Dr. Overly checked on the deceased and ordered (1) more pain medication; (2) the administration of fluids; (3) the transfusion of two units of blood; and (4) repeated CBCs on a monitoring schedule. Roughly one hour later, the junior urology resident visited the deceased to check on his catheter. After examining him, the junior resident gave the nurse a verbal order to obtain a consultation from vascular surgery regarding a possible retroperitoneal bleed. A short time later, the deceased was rushed to surgery. Prior to surgery, however, he experienced cardiac arrest and had to be revived. After being revived, the deceased underwent an operation to repair his femoral artery, which was punctured. Though the artery was repaired, the deceased suffered complications and experienced organ damage. He was put on a respirator and eventually died on August 4, 2008.

On August 3, 2009, Cright mailed written notice of a potential medical malpractice claim, along with a HIPAA-compliant authorization, to each of the defendants. On November 30, 2009, Cright filed the original complaint in this action. The case ultimately proceeded to trial on April 15, 2013. However, three days into trial, Cright moved for a voluntary nonsuit, which the trial court granted on May 3, 2013.

On May 30, 2013, Cright again sent notice of a potential medical malpractice claim to the defendants. A HIPAA-compliant authorization was not included with the notices. Rather, the notice letters that the defendants received included the following paragraph:

> Medical records of the entire UT Hospital admission at issue have previously been provided to you, as well as any other records you wished to obtain pursuant to an Agreed RAS Order entered in the original Knox County Circuit Court action under docket No. 2-5923-09.

(Bold font in original omitted.) Cright subsequently filed a new complaint against the defendants on January 3, 2014.

Dr. Overly and KCG filed a motion to dismiss, which raised the following argument:

> [Cright] has failed to comply with the requirements of Tenn. Code Ann. § 29-26-121 (the "Notice Statute") by: 1) failing to attach a medical authorization to the "notice letter" prior to filing the [c]omplaint in the instant action, required by Tenn. Code Ann. § 29-26-121(a)(2)(E); and 2) failing to demonstrate compliance with the Notice Statute by providing a certificate of mailing with the "notice letter" as required by Tenn. Code Ann. § 29-26-121(a)(4).

One week later, UHS filed a motion to dismiss, which also contended that Cright had failed "to comply with the provisions of Tenn. Code Ann. § 29-26-121" by neglecting to "submit a HIPAA-compliant medical records authorization with the pre-suit notice letter." Thereafter, Cright filed a motion to amend her complaint to include an affidavit from her attorney, which stated, in pertinent part, as follows:

3

A [HIPAA]-compliant medical authorization was not attached, because the parties had previously entered an [a]greed [o]rder that the RAS[3] service and record ordering procedure was to be the exclusive means for obtaining [the deceased's] medical records, to the exclusion of any medical authorizations previously provided. Pursuant to the RAS Order all [d]efendants had already received complete copies of all records in the possession of the other, as well as extensive records from many other health care providers predating the events at issue by many years. The complete record of the hospitalization at issue in this case was marked as an exhibit to Dr. Overly's deposition in 2010, was used throughout discovery of all other witnesses, and was marked for identification as an exhibit in the trial of this case that began in 2013. Since [the deceased] died in that hospitalization, there are no additional "updated" medical records to be obtained from any [d]efendant.

(Footnote added.)

The trial court conducted a hearing regarding the motions to dismiss and stated as follows:

It's clear from the record that there was no medical authorization filed with this case when it was refiled, that there was also no affidavit of pre-suit notice, there was also no certificate of mailing, which is required by [Tenn. Code Ann.§ 29-26-121]. Defendants agree that they used the same records that were used in the previous case to prepare for this case. However, the HIPAA authorization states clearly that it expires one year after it is signed. The RAS order states that it will be used in that particular case. It doesn't say that it can be used in any case, this case having a different docket number than the first one, even though the parties are the same.

The Court is of the opinion that under the current state of the law, the motions to dismiss should be granted, the case will

---

[3] Records Acquisition Services.

4

be dismissed without prejudice, as to all but the direct claims of negligence against [d]efendant [UHS] for its failure to supervise, monitor and enforce its own established policies, which will proceed under ordinary negligence.

The court subsequently entered an order dismissing all medical malpractice claims against the defendants while also preserving a general negligence claim by Cright against UHS. Prior to entry of the order, UHS filed an amended motion to dismiss and/or motion to reconsider, contending that (1) all of Cright's claims against UHS were grounded purely in medical malpractice and (2) any claim for simple negligence would be barred by the statute of limitations. Cright filed a motion to reconsider the trial court's dismissal of her medical malpractice claims. As the basis for this motion, Cright contended that (1) the defendants could not demonstrate any actual prejudice stemming from her omission of a HIPAA-compliant medical authorization; (2) the RAS order from the initial lawsuit was still in effect; (3) the defendants did not plead noncompliance with the pre-suit notice provisions contained in Tenn. Code Ann. § 29-26-121 in their answers, thereby waiving that defense; and (4) Cright's motion for a mistrial in the initial action should have been granted, which would have made a second pre-suit notice to the defendants unnecessary.

The trial court held a hearing on all outstanding motions. With respect to UHS's amended motion to dismiss and/or motion to reconsider, the trial court stated the following:

> This Court has considered [UHS's] motion to reconsider with regard to [the] ruling that the case against [UHS] is a negligence case. The amended complaint from the 2009 case, which was the complaint filed in 2013, does make allegations with reference to policies and procedures that [Cright] claims were violated, and [Cright's] claims are system failures on the part of [UHS]. The Court is asked to determine whether this is a case that is a [medical malpractice] act case or a negligence case instead. [UHS] claims that there are not two separate torts committed toward [the deceased], and that policies not followed does not move the case from outside the realm of [medical malpractice] to straight negligence. The Court in making that determination has looked at the [medical malpractice] act, which from the sheer name of it is [medical malpractice], which deals with the care of patients. From everything that the Court has reviewed, the Court is of the opinion that the systems failure that [Cright] complains of

deals with the care of patients and as a result that this is a [medical malpractice] claim.

And as a result, the Court is amending its ruling and dismissing the complaint against [UHS], based on a finding that no part of the claims alleged against UHS sound in ordinary negligence.

As for Cright's motion to reconsider the dismissal of the medical malpractice claims against the defendants, the trial court stated as follows:

Based on a review of everything again, the Court understands [Cright's] dissatisfaction with the Court's previous ruling. The Court recognizes that the original suit being filed in May of 2009, voluntarily being dismissed or non-suited, with the order entered May 3 of 2013, the action was refiled on January 3 of 2014, which again was within one year of the non-suit. [Cright] again contends that [she] complied with the notice requirement of [Tenn. Code Ann. §] 29-26-121, based on the notice of the original suit in 2009, and also that the HIPAA compliant release was provided in the original 2009 lawsuit. [Cright] on May 30, 2013[,] did give notice of her intention to refile this claim, which was sent by certified mail, return receipt. There was not the affidavit that is required by the statute that was filed. And as [Cright's attorney] admitted she prepared it, she just doesn't know what happened to it. The Court does not think that that, in and of itself, would be sufficient to dismiss this lawsuit.

And the Court has reviewed the **Hinkle** [**v. Kindred Hosp.**, No. M2010-02499-COA-R3-CV, 2012 WL 3799215 (Tenn. Ct. App., filed Aug. 31, 2012)] and **Foster** [**v. Chiles**, 467 S.W.3d 911 (Tenn. 2015)] decisions and believes that originally when [Cright] filed her suit in May of 2013 that [she] was of the opinion that she was complying with the law at the time. However, there was not a HIPAA compliant release supplied, even though [Cright] states that the medical records have been previously provided to the defendants in addition to other records pursuant to an agreed RAS order that was entered in the original Knox County Circuit Court

6

action. The court is still of the opinion that based on everything, that the Court ruled correctly based on the state of the law when the Court reviewed the case, and therefore, the Court overrules [Cright's] motion.

## II.

Cright raises the following issues, as quoted verbatim from her brief:

Was it error to dismiss [Cright's] claims for failure to provide a [HIPAA] authorization when the actual records had been produced, were no longer under [HIPAA] protection, and were freely used by the defendants to mount their defenses to this action?

If there was no substantial compliance, is [Cright] entitled to a waiver, given the circumstances of this case?

Was it error to dismiss all claims, when [the defendants] are liable under ordinary negligence?

(Numbering in original omitted.) Dr. Overly and KCG have raised an additional issue, as quoted verbatim from their brief:

Whether the motions in limine discussed by [Cright] are reviewable at this time.

(Numbering and italics in original omitted.)

## III.

On the issue of a Tenn. R. Civ. P. 12.02(6) motion to dismiss, we are guided by the following principles as articulated by the Supreme Court:

A Rule 12.02(6) motion challenges only the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence. *Highwoods Props., Inc. v. City of Memphis*, 297 S.W.3d 695, 700 (Tenn. 2009); *Willis v. Tenn. Dep't of Corr.*, 113 S.W.3d 706, 710 (Tenn. 2003); *Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg,*

7

***P.A.***, 986 S.W.2d 550, 554 (Tenn. 1999); ***Sanders v. Vinson***, 558 S.W.2d 838, 840 (Tenn. 1977)). The resolution of a 12.02(6) motion to dismiss is determined by an examination of the pleadings alone. ***Leggett v. Duke Energy Corp.***, 308 S.W.3d 843, 851 (Tenn. 2010); ***Trau-Med of Am., Inc. v. Allstate Ins. Co.***, 71 S.W.3d 691, 696 (Tenn. 2002); ***Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc.***, 878 S.W.2d 934, 938 (Tenn. 1994); ***Cornpropst v. Sloan***, 528 S.W.2d 188, 190 (Tenn. 1975). A defendant who files a motion to dismiss " 'admits the truth of all of the relevant and material allegations contained in the complaint, but . . . asserts that the allegations fail to establish a cause of action.' " ***Brown v. Tenn. Title Loans, Inc.***, 328 S.W.3d 850, 854 (Tenn. 2010) (quoting ***Freeman Indus., LLC v. Eastman Chem. Co.***, 172 S.W.3d 512, 516 (Tenn. 2005)); *see* ***Edwards v. Allen***, 216 S.W.3d 278, 284 (Tenn. 2007); ***White v. Revco Disc. Drug Ctrs., Inc.***, 33 S.W.3d 713, 718 (Tenn. 2000); ***Holloway v. Putnam Cnty.***, 534 S.W.2d 292, 296 (Tenn. 1976).

In considering a motion to dismiss, courts " 'must construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences.' " ***Tigg v. Pirelli Tire Corp.***, 232 S.W.3d 28, 31-32 (Tenn. 2007) (quoting ***Trau-Med***, 71 S.W.3d at 696); *see* ***Leach v. Taylor***, 124 S.W.3d 87, 92-93 (Tenn. 2004); ***Stein v. Davidson Hotel Co.***, 945 S.W.2d 714, 716 (Tenn. 1997); ***Bellar v. Baptist Hosp., Inc.***, 559 S.W.2d 788, 790 (Tenn. 1978); *see also* ***City of Brentwood v. Metro. Bd. of Zoning Appeals***, 149 S.W.3d 49, 54 (Tenn. Ct. App. 2004) (holding that courts "must construe the complaint liberally in favor of the plaintiff by . . . giving the plaintiff the benefit of all the inferences that can be reasonably drawn from the pleaded facts"). A trial court should grant a motion to dismiss "only when it appears that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." ***Crews v. Buckman Labs. Int'l, Inc.***, 78 S.W.3d 852, 857 (Tenn. 2002); *see* ***Lanier v. Rains***, 229 S.W.3d 656, 660 (Tenn. 2007); ***Doe v. Sundquist***, 2 S.W.3d 919, 922 (Tenn. 1999); ***Pemberton v. Am. Distilled Spirits Co.***, 664 S.W.2d

690, 691 (Tenn. 1984); *Fuerst v. Methodist Hosp. S.*, 566 S.W.2d 847, 848 (Tenn. 1978); *Ladd v. Roane Hosiery, Inc.*, 556 S.W.2d 758, 759–60 (Tenn. 1977). We review the trial court's legal conclusions regarding the adequacy of the complaint de novo. *Brown*, 328 S.W.3d at 855; *Stein*, 945 S.W.2d at 716.

*Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011).

This case also involves a statutory interpretation, which is a question of law that we also review de novo. *Pratcher v. Methodist Healthcare Memphis Hosp.*, 407 S.W.3d 727, 734 (Tenn. 2013). The Supreme Court has previously explained our standard of review:

> When interpreting a statute, our role is to ascertain and effectuate the legislature's intent. *Sullivan ex rel. Hightower v. Edwards Oil Co.*, 141 S.W.3d 544, 547 (Tenn. 2004). We must not broaden or restrict a statute's intended meaning. *Garrison v. Blickford*, 377 S.W.3d 659, 663 (Tenn. 2012) (quoting *U.S. Bank, N.A. v. Tenn. Farmers Mut. Ins. Co.*, 277 S.W.3d 381, 386 (Tenn. 2009)). We also presume that the legislature intended to give each word of the statute its full effect. *In re Estate of Trigg*, 368 S.W.3d 483, 490 (Tenn. 2012). When statutory language is unambiguous, we accord the language its plain meaning and ordinary usage. *Glassman, Edwards, Wyatt, Tuttle & Cox, P.C. v. Wade*, 404 S.W.3d 464, 467 (Tenn. 2013). Where the statutory language is ambiguous, however, we consider the overall statutory scheme, the legislative history, and other sources. *Mills v. Fulmarque, Inc.*, 360 S.W.3d 362, 368 (Tenn. 2012); *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn. 2008).

*Stevens ex rel. Stevens v. Hickman Cmty. Health Care Servs., Inc.*, 418 S.W.3d 547, 553 (Tenn. 2013).

## IV.

**A.**

Tenn. Code Ann. § 29-26-121(a) (Supp. 2009) provides as follows:

> (1) Any person, or that person's authorized agent, asserting a potential claim for medical malpractice shall give written notice of the potential claim to each health care provider that will be a named defendant at least sixty (60) days before the filing of a complaint based upon medical malpractice in any court of this state.
>
> (2) The notice shall include:
>
> \*     \*     \*
>
> (E) *A HIPAA compliant medical authorization permitting the provider receiving the notice to obtain complete medical records from each other provider being sent a notice.*

(Emphasis added.) The Supreme Court has previously explained why a HIPAA-compliant medical authorization is required in the pre-suit notice to defendants in medical malpractice actions:

> [T]he purpose of Tenn. Code Ann. § 29-26-121(a)(2)(E) is not to provide defendants with notice of a potential claim. Instead, Tenn. Code Ann. § 29-26-121(a)(2)(E) serves to equip defendants with the actual means to evaluate the substantive merits of a plaintiff's claim by enabling early access to a plaintiff's medical records. *Because HIPAA itself prohibits medical providers from using or disclosing a plaintiff's medical records without a fully compliant authorization form, it is a threshold requirement of the statute that the plaintiff's medical authorization must be sufficient to enable defendants to obtain and review a plaintiff's relevant medical records.* As a result, plaintiffs cannot satisfy Tenn. Code Ann. § 29-26-121(a)(2)(E) by simply notifying defendants that a healthcare liability claim may be forthcoming.

10

*Stevens*, 418 S.W.3d at 555 (emphasis added; internal citations omitted).

In the present action, it is undisputed that Cright failed to provide a HIPAA-compliant medical authorization. Rather, Cright, when she served the defendants with pre-suit notice of her intent to refile her action, referenced a 2010 agreed RAS order from the initial action. Nevertheless, "[a] plaintiff's less-than-perfect compliance with Tenn. Code Ann. § 29-26-121(a)(2)(E) . . . should not derail a healthcare liability claim." *Id.* Rather, "a plaintiff must substantially comply, rather than strictly comply, with the requirements of Tenn. Code Ann. § 29-26-121(a)(2)(E)." *Id.* When determining whether a plaintiff has substantially complied, "a reviewing court should consider the extent and significance of the plaintiff's errors and omissions and whether the defendant was prejudiced by the plaintiff's noncompliance." *Id.* at 556.

The 2010 agreed RAS order contained the following statement regarding how long it would remain valid: "This Order . . . *shall remain in effect until the final disposition of the above-styled lawsuit.*" (Emphasis added.) Three days into trial, Cright moved for a voluntary dismissal of the original action, which the court granted on May 3, 2013. As a result, the 2010 agreed RAS order ceased to remain effective on that date. Thus, the 2010 agreed RAS order that Cright is attempting to rely upon had been invalid for several months prior to the filing of this case in January 2014. Despite this fact, Cright contends in her brief that "[t]he record in this case demonstrates that no prejudice resulted to the defendants from the claimed deficiency of the notice provided" because the defendants had already accessed the deceased's medical records in the prior case. We disagree. "In limited circumstances, HIPAA provides for the *use* or disclosure of medical records without specific authorization 'by the covered entity to defend itself in a legal action.' " *Roberts v. Prill*, No. E2013-02202-COA-R3-CV, 2014 WL 2921930, at *6 (Tenn. Ct. App., filed June 26, 2014) (quoting 45 C.F.R. § 164.508(a)(2)(i)(C)) (emphasis in original). "However, HIPAA generally provides that a covered entity may not '*use* or disclose protected health information without' valid authorization." *Roberts*, 2014 WL 2921930, at *6 (quoting 45 C.F.R. § 164.508(a)(1)) (emphasis in original). The case now before us is not covered by one of the narrow exceptions that allows for use of a patient's medical records without authorization. Ultimately, while the defendants had access to the deceased's medical records after obtaining them during the initial action, they were not entitled to use those records in the present case in the absence of a HIPAA-compliant medical authorization entitling them to do so. With the substantial-compliance analysis from *Stevens* in mind, we find that Cright's failure to provide a medical authorization in this case is significant and would necessarily prejudice the defendants if this case proceeded further.

**B.**

11

Cright contends that, even if her pre-suit notice to defendants was deficient, she is still entitled to a waiver for extraordinary cause. The Supreme Court has previously discussed "extraordinary cause" in the context of Tenn. Code Ann. § 29-26-121:

> The statute does not define "extraordinary cause," and the statute's legislative history does not indicate that the legislature intended to assign a meaning to that phrase other than its plain and ordinary meaning. "Extraordinary" is commonly defined as "going far beyond the ordinary degree, measure, limit, etc.; very unusual, exceptional; remarkable." *Webster's New World Dictionary of the American Language*, 516 (1966); *see also **State v. Vikre***, 356 S.W.2d 802, 804 ([N.C. Ct. App.] 1987) (adopting dictionary definition of extraordinary cause as "going beyond what is usual, regular, common, or customary . . . of, relating to, or having the nature of an occurrence or risk of a kind other than what ordinary experience or prudence would foresee." One legal scholar, commenting on Tennessee Code Annotated sections 29-26-121 and 122, has noted that possible examples of "extraordinary cause" might include "illness of the plaintiff's lawyer, a death in that lawyer's immediate family, [or] illness or death of the plaintiff's expert in the days before the filing became necessary."

***Myers v. AMISUB (SFH), Inc.***, 382 S.W.3d 300, 310-11 (Tenn. 2012). In her brief, Cright offers multiple explanations for why she believes extraordinary cause should be found in this case. First, she argues that "[w]hile this is a refiled action after a non-suit, and technically a 'new' action, there were circumstances existing in this case that gave all parties notice that the non-suit was not 'the conclusion' of the controversy." Second, she asserts that "[t]he state of the law applicable at relevant times should be considered." Third, Cright claims that the 2010 agreed "RAS [o]rder reflected the past agreement of the parties that took the records outside of the use of further HIP[A]A authorizations altogether." Fourth, she maintains that the defendants "had waived the opportunity to raise the issue of any failure to comply with the notice statute because it was not properly pled in either of their [a]nswers." Fifth, Cright states that to "dismiss this case for a HIP[A]A authorization when the defendants have freely utilized the records in their defense of [Cright's] claims is against all logic and would be a severe injustice to . . . Cright." Finally, she notes the "judicial preference to have cases decided on their merits."

Regardless of how Cright wants to characterize the present action, it is still separate and distinct from the prior action she voluntarily non-suited in 2013. While the defendants may have anticipated that Cright would refile her medical malpractice claim, such speculation is of no consequence and does not absolve Cright of the need to provide a medical authorization in compliance with Tenn. Code Ann. § 29-26-121(a), a statutory requirement that existed before both the initial action and the present action. Furthermore, as we have already explained, the 2010 agreed RAS order is functionally irrelevant to the present action as it ceased to remain in effect once the trial court granted Cright a voluntary non-suit on May 30, 2013. Though Cright insists that this prior agreed order should have some bearing on our extraordinary cause analysis, we disagree with this assertion. There is nothing "extraordinary" in the facts of this case as that term is defined in *Myers*, 382 S.W.3d at 310-11.

Cright readily acknowledges that the defendants, by failing to include a defense in their answers, did *not* waive their defense of failure to comply with the notice statute. She even cites to an opinion authored by this Court supporting the defendants' position on this issue. *See **Blankenship v. Anesthesiology Consultants Exch., P.C.***, 446 S.W.3d 757, 760 (Tenn. Ct. App. 2014) ("Because Tenn. R. Civ. P. 12.08 provides that Defendant could have presented this defense even as late as 'at the trial on the merits,' we cannot find that Defendant waived the defense of failure to state a claim upon which relief can be granted simply because Defendant engaged in discovery prior to filing its motion. We note that Defendant gives an explanation as to its delay in raising this defense. We, however, need not address this explanation as the clear language of Tenn. R. Civ. P. 12.08 resolves this waiver issue."). Despite that unambiguous holding, Cright still insists that "there must be some consequence [for] a defendant['s] failure to properly plead such a 'threshold' issue." Ultimately, Tenn. R. Civ. P. 12.08 is clear on this issue, and we need not entertain Cright's request, which would run counter to established law.

Finally, we are not persuaded by Cright's contention that dismissal because of the absence of a medical authorization would be "against all logic" and would be a "severe injustice" to her. Tenn. Code Ann. § 29-26-121(a) clearly sets forth what is required when a party provides pre-suit notice of an impending medical malpractice claim. Cright failed to comply with a significant part of those requirements, instead choosing to rely upon a 2010 agreed RAS order from the prior action in place of a HIPAA-compliant medical authorization. This failure by Cright is substantial given the fact that the agreed order ceased to be effective several months before the present action was filed and would not entitle the defendants to use of the deceased's medical records in this action. In our view, it would be "against all logic" to hold that a long-invalid order is now operable and sufficient to stand in place of a medical authorization that is required by statute. While

13

we do not favor procedural dismissals, accepting Cright's argument would render a very strained interpretation of Tenn. Code Ann. § 29-26-121(a) that would thwart the Legislature's intent. Accordingly, we affirm the trial court's decision refusing to grant Cright a waiver for her noncompliance due to extraordinary cause.

## C.

Cright goes on to contend that the trial court erred by dismissing all claims against the defendants because she believes they are still liable under ordinary negligence. Because the cause of this action originated prior to the 2011 amendments to the Tennessee Medical Malpractice Act, the common law at that time is our guide to distinguishing a medical malpractice claim from a claim sounding in ordinary negligence.[4] As all parties to this appeal note in their briefs, *Estate of French v. Stratford House*, 333 S.W.3d 546 (Tenn. 2011), provides instructive insights into delineating the difference between these two types of claims. Specifically, the Supreme Court stated the following:

> Whether claims are characterized as ordinary negligence or medical malpractice affects the nature of the litigation. A medical malpractice claimant must establish the statutory elements through the testimony of an expert who meets the qualifications set forth in Tennessee Code Annotated section 29-26-115(b). *See Barkes v. River Park Hosp., Inc.*, 328 S.W.3d 829, 833 (Tenn. 2010) ("Unless the negligence is obvious and readily understandable by an average layperson, expert testimony will be required to demonstrate the applicable standard of care and breach of that standard."); *Seavers v. Methodist Med. Ctr. of Oak Ridge*, 9 S.W.3d 86, 92 (Tenn. 1999) ("Expert testimony is required in medical malpractice cases to assist and to educate the trier of fact

---

[4] "The General Assembly amended the Medical Malpractice Act in 2011 to modify the definition of 'health care liability action' to include 'claims against state or a political subdivision thereof.' Act of May 20, 2011, ch. 510 § 8, 2011 Tenn. Pub. Acts. 510, 1506 (codified as amended at Tenn. Code Ann. § 29-26-101(a) (2012)). The 2011 amended became effective on October 1, 2011[.] . . . The 2011 amendment does not apply retroactively[.] *See In re D.A.H.*, 142 S.W.3d 267, 273-74 (Tenn. 2004) (explaining that all statutes are presumed to apply prospectively unless otherwise stated but procedural or remedial statutes that do not affect vested rights may apply retrospectively)." *Cunningham v. Williamson Cnty. Hosp. Dist.*, 405 S.W.3d 41, 45 n.2 (Tenn. 2013).

14

unless the alleged malpractice lies within the common knowledge of lay persons."). . . .

Because medical malpractice is a category of negligence, the distinction between medical malpractice and negligence claims is subtle; there is no rigid analytical line separating the two causes of action. *Draper v. Westerfield*, 181 S.W.3d 283, 290 (Tenn. 2005); *Gunter* [*v. Memphis Hous. Auth.*], 121 S.W.3d [636,] 639 [(Tenn. 2003)] (quoting *Weiner v. Lenox Hill Hosp.*, 673 N.E.2d 914, 916 ([N.Y.] 1996)). In *Gunter*, a suit involving allegations of negligence by a laboratory with regard to a paternity test, this Court observed that the distinguishing feature between ordinary negligence and medical malpractice cases is whether "a plaintiff's claim is for injuries resulting from negligent medical treatment." 121 S.W.3d at 640. We embraced the standard set forth by the New York courts for distinguishing an ordinary negligence claim from one based upon medical malpractice:

> [W]hen a claim alleges negligent conduct which constitutes or bears a substantial relationship to the rendition of medical treatment by a medical professional, the medical malpractice statute is applicable. Conversely, when the conduct alleged is not substantially related to the rendition of medical treatment by a medical professional, the medical malpractice statute does not apply.

*Id.* at 641. . . .

Our Court of Appeals has further defined the standard set forth in *Gunter* and reaffirmed in *Draper*:

> Medical malpractice cases typically involve a medical diagnosis, treatment or other scientific matters. The distinction between ordinary negligence and malpractice turns on whether the acts or omissions complained of involve a matter of medical science or art requiring

15

> specialized skills not ordinarily possessed by
> lay persons or whether the conduct complained
> of can instead be assessed on the basis of
> common everyday experiences of the trier of
> fact.
>
> *Peete v. Shelby Cnty. Health Care Corp.*, 938 S.W.2d 693,
> 696 (Tenn. Ct. App. 1996) (quoting *Graniger v. Methodist
> Hosp. Healthcare Sys.*, No. 02A01-9309-CV-00201, 1994
> WL 496781, at \*3 (Tenn. Ct. App.[, filed] Sept. 9, 1994)). *If
> the alleged breach of the duty of care set forth in the
> complaint is one that was based upon medical art or science,
> training, or expertise, then it is a claim for medical
> malpractice. If, however, the act or omission complained of
> is one that requires no specialized skills, and could be
> assessed by the trier of fact based on ordinary everyday
> experiences, then the claim sounds in ordinary negligence.
> See* **Conley v. Life Care Ctrs. of Am., Inc.**, 236 S.W.3d 713,
> 729-30 (Tenn. Ct. App. 2007).

*Estate of French*, 333 S.W.3d at 555-56 (emphasis added).

Cright alleged in her complaint that Dr. Overly and KCG were negligent by doing the following:

> (a) failing to adequately follow-up with examinations and
> appropriate testing when symptoms of the known
> complication of internal bleeding manifested on July 29,
> 2008;
>
> (b) failing to timely recognize the symptoms of internal
> bleeding and obtain appropriate consultations and/or
> treatment;
>
> (c) failing to adequately communicate with other physicians
> and/or nurses regarding [the deceased's] condition;
>
> (d) failing to follow up on the results of the [u]rology consult,
> or give report of the status of [the deceased's] condition to the
> on-call cardiology resident, or to request the cardiology

resident on call to follow up and monitor [the deceased's] condition through the night;

(e) failing to timely obtain a consult from a vascular surgeon to examine and assist in the monitoring of [the deceased] once the signs and symptoms of internal bleeding manifested on June 29, 2008, or an emergen[cy] consult on June 30, 2008[;]

(f) failing to recognize the significance of and/or properly treat [the deceased's] prolonged, severe and deepening shock at 8:00am, even after the results of the CT scan were known to Dr. Overly and he claims to have recognized that [the deceased] was in hypovolemic shock from blood loss, and had been in shock for many hours.

All of these claims against Dr. Overly and KCG pertain to examining the deceased for signs of internal bleeding and his subsequent treatment. It appears quite clear to us that analyzing each of these allegations would require specialized medical knowledge that a lay person would not ordinarily possess. In our view, a regular person without an advanced medical background would hardly be able to assess symptoms of internal bleeding, much less determine the severity of the deceased's condition or decide whether treatment was rendered in a timely manner. Accordingly, all of these claims sound in medical malpractice, and the trial court was correct in designating them as such. As for UHS, Cright alleged the following negligent acts:

(a) failing to recognize the symptoms of internal bleeding and request examination of [the deceased] by appropriate physicians;

(b) failing to adequately monitor [the deceased's] condition and make appropriate entries in his chart for reference by other nurses and physicians;

(c) failing to adequately report [the deceased's] condition to appropriate physicians;

(d) failing to seek direction from appropriate health care providers;

17

(e) failing to communicate to appropriate physicians the seriousness and/or severity of [the deceased's] condition;

(f) failing to timely communicate to appropriate physicians the results reported on the CT scan of July 29, 2008;

(g) failing to promptly carry out the orders that were given the morning of June 30;

(h) failing to timely request the vascular surgery consultation on the morning of July 30, 2008;

(i) failing to seek assistance from appropriate personnel if nursing reports to physicians regarding [the deceased's] condition were not receiving adequate physician response;

(j) failing to follow its own policies, procedures, and the standards of acceptable practice it has set for itself and advertises to the public [that it] will apply to patients treated at its facility[;]

(k) failing to have proper systems in place to insure: proper training of nurses caring for patients at risk for internal bleeding; adequate communication of critical results on imaging studies to appropriate physicians; and proper documentation and communication of critical blood pressure readings to physicians.

As with Cright's allegations against Dr. Overly and KCG, these claims against UHS also sound in medical malpractice. Recognizing symptoms of internal bleeding, accurately updating the deceased's medical chart, knowing what physicians should be contacted about the deceased's condition, carrying out specific orders to treat the deceased, and realizing when the deceased should have obtained a vascular surgery consultation are all tasks that an ordinary person would be unable to accomplish without an advanced medical background. Similarly, we believe that knowing whether hospital procedures, training, documentation, and communication were proper would be beyond the scope of an ordinary person's basic understanding. Accordingly, the trial court was correct in determining that these claims fit within the framework of medical malpractice as opposed to negligence.

18

**D.**

Lastly, Cright contends that two "motions in limine are ripe for review and should be granted." One of these motions sought to prevent any of the defendants from "attempting to 'shift blame' to any non-party in light of the fact that no defendant has ever pled comparative fault." The other aimed to stop "Dr. Overly and/or others [from] present[ing] irrelevant testimony about how he correctly performed the stent procedure the day before the negligence occurred." Despite Cright's arguments, this issue has been rendered moot based upon our decision to affirm the trial court's rulings as to as to (1) Cright's failure to comply with the pre-suit notice provisions of Tenn. Code Ann. § 29-26-121(a) and (2) the fact that all of her claims against the defendants sound in medical malpractice. Accordingly, we decline to address the issue.

**V.**

The trial court's grant of the motions to dismiss is affirmed. Costs on appeal are assessed to the appellant, Catherine Cright. This case is remanded, pursuant to applicable law, for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE